25 F.3d 559
 63 USLW 2016
 BECK OIL COMPANY, INCORPORATED, Daryl Becker, doing business
as E.P. Becker, Incorporated, V.W. Bowman Oil
Company, Incorporated, et al.,
Plaintiffs-Appellants,
v.
TEXACO REFINING AND MARKETING, INCORPORATED, Defendant-Appellee.
 No. 93-2574.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 11, 1994.
Decided June 1, 1994.
 
 Robert T. Hall, Springfield, IL and Gregg R. Potvin (argued), Taylor, Thiemann & Aitken, Washington, DC, for plaintiffs-appellants.
 Steven Nardulli, Stratton, Dobbs & Nardulli, Springfield, IL, and Joseph A. Girardi (argued), and Ana M. Downs, O'Connor, Schiff & Myers, Chicago, IL, for defendant-appellee.
 Before BAUER, ESCHBACH, and ROVNER, Circuit Judges.
 BAUER, Circuit Judge.
 
 
 1
 In 1985, Texaco Refining and Marketing, Inc. (TRMI), decided to withdraw from marketing motor fuels at retail in a contiguous area spanning Illinois, Wisconsin, Indiana, and Kentucky. In furtherance of this decision, TRMI terminated all franchise agreements with franchisees whose marketing premises were located within this contiguous area. Five former franchisees, all of whom operated in Illinois, filed this action claiming that the termination of their franchises violated the Petroleum Marketing Practices Act (PMPA). The parties stipulated that the only issues turned on an interpretation of Sec. 2802(b)(2)(E) of the PMPA. The district court granted TRMI's motion for summary judgment, and we affirm.
 
 
 2
 This saga begins with Texaco's 1984 purchase of Getty Oil Company, in which Texaco obtained the rights to market, in certain areas, gasoline and other petroleum products under the "Getty" brand name. Texaco subsequently reorganized and, in 1985, formed TRMI as a wholly-owned subsidiary to perform the refining and marketing operations, wholesale and retail, associated with the Texaco brand of motor fuels and other petroleum products.
 
 
 3
 TRMI's first item of business was to evaluate its operations across the United States. In January 1985, TRMI made the decision to withdraw its marketing at retail through service stations and at wholesale to distributors within the aforementioned contiguous area. It reached this decision for several reasons. The primary reason was that its Lawrenceville, Illinois refinery had significantly decreased in cost efficiency. The refinery was technologically outdated. In addition, the local source of crude oil for the refinery, the Salem, Illinois oil fields, experienced a severe diminution of production; without a local source of crude oil, the cost of crude oil refined at Lawrenceville included a large component for transportation. Cumulatively, these factors caused the average cost per barrel of finished gasoline produced by the Lawrenceville refinery to exceed by $2 the average market price for finished gasoline. TRMI determined that the refinery was no longer cost competitive within the industry and must be closed.
 
 
 4
 The other reasons for TRMI's decision to withdraw are related. First, with the Lawrenceville refinery closed, TRMI required a different method of supplying refined petroleum products. It discovered that other methods of supplying refined petroleum products to that area were prohibitively expensive; simply put, it cost too much to transport refined products from geographically distant refineries to the contiguous area. In addition, TRMI determined that Getty's method of supplying this area was also economically infeasible. Even if Getty's method was acceptable, it was only responsible for ten percent of the products required for distribution. Thus, TRMI decided that it must withdraw its marketing efforts from the contiguous area in sixty-nine counties in Illinois, forty-seven counties in Wisconsin, eighty-eight counties in Kentucky, and seventy-four counties in Indiana.
 
 
 5
 In March, TRMI notified the Governors of the four states of its withdrawal. Later that month, it sent written notices of termination to all of its franchisees whose marketing premises were located in the withdrawal area.[1] The termination was effective in September, 1985.
 
 
 6
 The former franchisees originally filed suit against Texaco, Inc. in 1985. TRMI was subsequently substituted for Texaco, Inc. as the real party in interest. By agreement, the district court dismissed this case in 1989, but permitted the franchisees to refile within six months. The franchisees refiled and, during the course of the litigation, the parties stipulated that the sole issue in the case concerned TRMI's liability pursuant to the PMPA. The parties agreed to conduct discovery relevant to liability only and file cross-motions for summary judgment. This was done, and the district court granted summary judgment to TRMI and denied it to the former franchisees.
 
 
 7
 We review de novo a district court's grant of summary judgment. Doe v. Allied-Signal Inc., 925 F.2d 1007, 1008 (7th Cir.1991). We "must view the record and all inferences drawn from it in the light most favorable to the party opposing the motion." Griffin v. Thomas, 929 F.2d 1210, 1212 (7th Cir.1991) (citations omitted). If the moving party initially shows the court that there is an absence of a question of fact, the nonmoving party has the burden of establishing that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). A fact is material only if it might affect the outcome of the case under the governing law.
 
 
 8
 In support of its motion for summary judgment, TRMI filed a twenty-four page statement of uncontested facts, which was supported by affidavits of TRMI officers and employees and other exhibits. The former franchisees failed to file a response to TRMI's statement of uncontested facts, but moved to strike or suppress the statement. This course of action violated Local Rule 2.9(D) of the Central District of Illinois which provides:
 
 
 9
 Any party opposing a motion for summary judgment on ground that material facts are in issue shall serve and file with the responsive memorandum of law, a concise "Statement of Genuine Issues," setting forth all material facts contended to be in issue with citation to discovery material or affidavit that supports the contention.
 
 
 10
 The district court brought this rule to the attention of the former franchisees and then denied them leave to file a Rule 2.9(D) statement. Not to be deterred, the former franchisees argued, first to the district court in their memorandum in support of their motion for summary judgment and then in their brief to this court, the existence of genuine issues of material facts. These facts either do not refute the statement of uncontested facts or are not at all relevant to the disposition of this case. Thus, we must determine whether TRMI is entitled to judgment as a matter of law under the PMPA.
 
 
 11
 Congress enacted the PMPA in response to the vast disparity in bargaining power between major oil companies and their franchisees and designed the PMPA to level the playing field between the franchisors and the franchisees. See S.Rep. No. 731, 95th Cong., 2d Sess. 17 (1978), reprinted in 1978 U.S.C.C.A.N. 873, 874 ("Senate Report"). Specifically, "Congress enacted the PMPA in an effort to protect 'franchisees from arbitrary or discriminatory termination or non-renewal of their franchises.' " Brach v. Amoco Oil Co., 677 F.2d 1213, 1216 (7th Cir.1982) (quoting Senate Report, at 15). The PMPA, then, permits an oil company to terminate a franchise only on certain grounds. Id. at 1220. "While most of the grounds relate to serious franchisee misconduct, others reflect an intent to permit the franchisor to exercise reasonable business judgment" in terminating a franchise. Id.
 
 
 12
 With this background in mind, we turn to the specific issues in this case. The parties agree that 15 U.S.C. Sec. 2802(b), which addresses the termination or nonrenewal of the franchise relationship, governs this case. This section states:
 
 
 13
 (2) For purposes of this subsection, the following are grounds for termination of a franchise or nonrenewal of a franchise relationship:
 
 
 14
 (E) In the case of any franchise entered into prior to June 19, 1978, and in case of any franchise entered into or renewed on or after such date (the term of which is 3 years or longer, or with respect to which the franchisee was offered a term of 3 years or longer), a determination made by the franchisor in good faith and in the normal course of business to withdraw from the marketing of motor fuel through retail outlets in the relevant geographic market area in which [the franchisee's] marketing premises are located....
 
 
 15
 In light of this section of the PMPA, the parties stipulated to the following issues:
 
 
 16
 (a) Whether [TRMI's] determination to withdraw was made in good faith and in the normal course of business, as required by 2802(b)(2)(E) of the Petroleum Marketing Practices Act; and
 
 
 17
 (b) Whether the area withdrawn from by [TRMI] was a relevant geographic marketing area in which [the former franchisees'] marketing premises were located, as required by 2802(b)(2)(E) of the PMPA.
 
 
 18
 We begin with the question of whether TRMI's decision to withdraw was made in good faith and in the normal course of business. We find a certain passage in the Senate Report, at 37, U.S.Code Cong. & Admin.News 1978, p. 896, particularly instructive:
 
 
 19
 This good faith test is meant to preclude sham determinations from being used as an artifice for termination or non-renewal. The second test is whether the determination was made "in the normal course of business." Under this test, the determination must have been the result of the franchisor's normal decision making process. These tests provide adequate protection of franchisees from arbitrary and discriminatory termination or non-renewal, yet avoid judicial scrutiny of the business judgment itself. Thus, it is not necessary for the courts to determine whether a particular marketing strategy, such as market withdrawal ... is a wise business decision.
 
 
 20
 This test for good faith is one of subjective intent. Massey v. Exxon Corp., 942 F.2d 340, 344 (6th Cir.1991); Brach, 677 F.2d at 1222-23 (citing Munno v. Amoco Oil Co., 488 F.Supp. 1114, 1118-21 (D.Conn.1980)). Hence, as long as we determine that TRMI did not have a discriminatory motive and find that the reasons it has given for its withdrawal are not a pretext disguising an improper purpose, we will conclude that TRMI has met its burden of good faith required by the PMPA. Massey, 942 F.2d at 344; Brach, 677 F.2d at 1223.
 
 
 21
 First, the former franchisees do not claim that TRMI terminated some of the franchises in the withdrawal area and permitted other franchises to continue. So there is no allegation of discriminatory termination of the former franchisees. Second, TRMI has provided the court below and this court with comprehensive evidence that its decision to withdraw from marketing in this four-state area was driven by purely economic reasons: it could not sell petroleum products in this region at a profit. This evidence includes a twenty-four page statement of facts and several affidavits of its officers and employees. These affidavits recount the studies and analysis TRMI performed regarding the economic infeasibility of continuing to market in this region. "Given its express concern that franchisors be accorded sufficient flexibility to respond to [changing] market conditions, Congress certainly did not contemplate the perpetuation of an economically burdensome franchise relationship." Brach, 677 F.2d at 1223. While it is likely not necessary to demonstrate severe economic loss to prove one's good faith, in this case, TRMI's detailed explanation that the specter of economic losses drove its decision to withdraw from this area indicates that this was not an arbitrary or a sham determination and, thus, was made in good faith under the PMPA.
 
 
 22
 In determining whether an oil company made its decision to withdraw in the normal course of business, the evidence indicative of good faith is likely to be instructive; we find it so in this case. TRMI offered evidence that it performed studies and analyzed its operations across the United States which indicated that the withdrawal area would lose money. TRMI claims that this course of conduct conforms with their standard operating procedures; they frequently "run the numbers" to determine whether certain business operations make economic sense. We have no reason to disbelieve TRMI; this scenario seems an altogether appropriate method to make most business decisions. In light of the evidence that TRMI offered, we are convinced that TRMI's decision to withdraw from the four-state area was a good faith one made in the normal course of business.
 
 
 23
 Turning to the second issue, the Senate Report on the PMPA is not as instructive in interpreting the phrase "relevant geographic market area." It states:
 
 
 24
 As a matter of law, it is provided that withdrawal from the entirety of a state or the entirety of a standard metropolitan statistical area will constitute withdrawal from a relevant geographic market area. Withdrawals from less than an entire state or from less than an entire standard metropolitan statistical area may, in view of the marketing operations and size of the franchisor, constitute a withdrawal from a relevant geographic market area for purposes of the title. The purpose of the definition is, therefore, to preclude judicial construction which would require a franchisor to withdraw from a multi-state region or from more than a standard metropolitan statistical area prior to satisfying the market withdrawal criteria of the title.
 
 
 25
 Senate Report, at 33, U.S.Code Cong. & Admin.News 1978, p. 891. This case does not involve withdrawal from an entire state or from a large metropolitan area, which would clearly satisfy the statute. It does, however, involve more than simply the partial withdrawal from one state. TRMI withdrew from a significant geographic area: a contiguous four-state area comprised of 278 counties.
 
 
 26
 In determining whether this withdrawal comports with the PMPA, we can again draw on the background of the Act. It appears to us that the "relevant geographic market area" requirement is intended to impede an oil company's efforts to take advantage of its superior bargaining position to exact an unfair concession from a franchisee (or small group of franchisees) by threatening withdrawal. We do not believe that TRMI has acted improperly here.
 
 
 27
 The Senate Report indicates that a "geographic market area" is "relevant" if it is large or economically significant. Certainly, the area from which TRMI withdrew is quite large indeed. In addition, while sheer size of the withdrawal area is an important consideration, other factors are to be considered to ensure that oil companies do not act improperly in making decisions to withdraw. Naturally, our consideration of this issue is informed by the factors comprising our "good faith" and "normal course of business" analyses. In this case, we believe one of these factors, that TRMI could not economically supply the withdrawal area, to be most significant in determining whether the withdrawal area is a "relevant geographic market area." TRMI demonstrated that it was forced to close the refinery overwhelmingly responsible for supplying the withdrawal area with petroleum products and could not economically develop an alternative method of supply; facts the former franchisees do not dispute. This factor distinguished other areas in which TRMI maintained its presence from the withdrawal area in that the former had other methods of supply. TRMI has thus sufficiently shown the withdrawal area to be both large and economically significant; therefore, we find that the withdrawal area is a "relevant geographic market area" for the purposes of the PMPA.[2]
 
 
 28
 In conclusion, we find no genuine issue of material fact in this case. In addition, we conclude that the area from which TRMI withdrew was a "relevant geographic market area" and that TRMI's decision to withdraw was made in good faith and in the normal course of business pursuant to the PMPA. The district court's decision granting summary judgment to TRMI is
 
 
 29
 AFFIRMED.
 
 
 
 [1]
 The franchisees in this case were former franchisees of either Texaco or Getty. Upon the formation of TRMI, the franchise agreements were assigned to that entity
 
 
 [2]
 There is no question, notwithstanding the arguments of the former franchisees to the contrary, that the franchisees' franchise premises are contained within this geographic area