**BP WEST COAST PRODUCTS LLC, a Delaware limited liability corporation, Plaintiff,**

v.

**Robert GREENE, an individual, Defendant.**

**And Related Counterclaims**

**No. CV F 02–6257 AWI SMS.**

United States District Court, E.D. California.

April 28, 2004.

Jeffrey M. Hamerling, Kari S. Gregory, Piper Rudnick LLP, San Francisco, CA, for BP West Coast Products LLC, a Delaware limited liability company, plaintiff.

Thomas P Bleau, Bleau Fox and Fong, Los Angeles, CA, for Greene Robert, defendant.

**MEMORANDUM OPINION AND ORDER GRANTING PLAINTIFF BP WEST COAST PRODUCT LLC'S MOTION FOR SUMMARY JUDGMENT**

ISHII, District Judge.

In this action, Plaintiff BP West Coast Products LLC ("BPWCP") requests that the court find it did not violate the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2801, *et. seq.*, when BPWCP

did not renew a franchise and offered to sell a Facility. Defendant Robert Greene ("Greene") has filed a counterclaim in which he contends BPWCP violated the PMPA and California Business and Professions Code § 17200. Pending before the court is Plaintiff BPWCP's motion for summary judgment on BPWCP's declaratory relief claims and Greene's counterclaims.

## PROCEDURAL HISTORY

On October 11, 2002, Plaintiff BPWCP filed a complaint for declaratory relief. BPWCP requests a declaratory judgment finding that BPWCP complied with its obligations under the PMPA and that state laws concerning the subject of this dispute are preempted, or alternatively, that BPWCP complied with any applicable state laws.

On January 30, 2003, Defendant Greene filed a motion to dismiss the complaint in which he contended that the PMPA does not confer jurisdiction over an action where a franchisor requests a declaratory judgment against a franchisee. On February 14, 2003, BPWCP filed an opposition. On March 11, 2003, the court denied Greene's motion and found the court has jurisdiction over BPWCP's declaratory relief action to determine if BPWCP violated the PMPA.

On March 17, 2003, BPWCP filed a first amended complaint.

On April 9, 2003, Greene filed a counterclaim for damages and injunctive relief against BPWCP for violations of the PMPA and for restitution and injunctive relief against BPWCP and Doe Defendants under California Business and Professions Code § 17200.

On March 19, 2004, BPWCP filed a motion for summary judgment. BPWCP contends that it complied with the PMPA, and as such, BPWCP is entitled to summary judgment on all of the PMPA claims.

BPWCP also contends it is entitled to summary judgment on Greene's Section 17200 claim because it is preempted by the PMPA or is not sufficiently related to the PMPA to form the same case or controversy.

On April 5, 2004, Greene filed an opposition. Greene contends BPWCP's decision and actions were not in good faith and in the normal course of business. Greene contends the bidding scheme necessarily resulted in offers, which were used as right of first refusal offers, that included other components, such as goodwill. Greene contends BPWCP cannot rely on its notice of nonrenewal. Greene contends BPWCP is not entitled to summary judgment as a matter of law.

On April 12, 2004, BPWCP filed a reply.

## LEGAL STANDARD

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Poller v. Columbia Broadcast System*, 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); *Jung v. FMC Corp.*, 755 F.2d 708, 710 (9th Cir.1985); *Loehr v. Ventura County Community College Dist.*, 743 F.2d 1310, 1313 (9th Cir.1984).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

For claims were the moving party has the burden of proof at trial, that party must carry its initial burden at summary judgment by presenting evidence affirmatively showing, for all essential elements of its case, that no reasonable jury could find for the non-moving party. *United States v. Four Parcels of Real Property,* 941 F.2d 1428, 1438 (11th Cir.1991) (en banc); *Calderone v. United States,* 799 F.2d 254, 259 (6th Cir.1986); *see also E.E.O.C. v. Union Independiente de la Autoridad de Acueductos y Alcantarillados de Puerto Rico,* 279 F.3d 49, 55 (1st Cir.2002) (stating that if "party moving for summary judgment bears the burden of proof on an issue, he cannot prevail unless the evidence that he provides on that issue is conclusive.")

For claims were the "nonmoving party will bear the burden of proof at trial, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Id.* at 322, 106 S.Ct. 2548. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.*

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 288–89, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); *Ruffin v. County of Los Angeles,* 607 F.2d 1276, 1280 (9th Cir.

1979). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the mere allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Rule 56(e); *Matsushita,* 475 U.S. at 586 n. 11, 106 S.Ct. 1348; *First Nat'l Bank,* 391 U.S. at 289, 88 S.Ct. 1575; *Strong v. France,* 474 F.2d 747, 749 (9th Cir.1973). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, *Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505; *Wool v. Tandem Computers, Inc.,* 818 F.2d 1433, 1436 (9th Cir.1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank,* 391 U.S. at 290, 88 S.Ct. 1575; *T.W. Elec. Serv.,* 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348 (quoting Fed.R.Civ.P. 56(e) advisory committee's note on 1963 amendments); *International Union of Bricklayers v. Martin Jaska, Inc.,* 752 F.2d 1401, 1405 (9th Cir.1985). In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to inter-

rogatories, and admissions on file, together with the affidavits, if any. Rule 56(c); *Poller,* 368 U.S. at 468, 82 S.Ct. 486; *SEC v. Seaboard Corp.,* 677 F.2d 1301, 1305–06 (9th Cir.1982). The evidence of the opposing party is to be believed, *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348 (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)(per curiam)); *Abramson v. University of Hawaii,* 594 F.2d 202, 208 (9th Cir.1979). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *Richards v. Nielsen Freight Lines,* 602 F.Supp. 1224, 1244–45 (E.D.Cal.1985), *aff'd,* 810 F.2d 898, 902 (9th Cir.1987).

## FACTS

Until June 2003, BPWCP owned the real property and improvements of the ARCO-branded facility and AM/PM Mini Market located at 3611 S. Mooney Boulevard, Visalia California and known as Facility Number 6024 ("the Facility"). Prior to June 2003, Greene operated the Facility as a franchisee and lessee pursuant to two written franchise agreements. Greene purchased the Facility in June 2003. Although Greene no longer leases the Facility from BPWCP, the Facility was sold as an "operational ARCO/am/pm" franchise and Greene still operates the Facility pursuant to a franchise agreement.

In 2001, after evaluating a number of facilities, BPWCP's management decided that it was in the company's best financial and business interests to recover its capital investments in the Facility by selling its interest in the real estate and improvements.[1] Greene claims BPWCP not only wanted to obtain the profits from the sale of the real estate and improvements but continue to retain the profits from the sale of gasoline and royalties from the AM/PM franchisee's convenience store sales.

On July 31, 2002, almost a full year before the original June 1, 2003 expiration date of the agreements, BPWCP officially notified Greene of its decision to sell the Facility and nonrenew the parties' franchise relationship. In this Notice of Nonrenewal, BPWCP cited to PMPA Section 2802(b)(3)(D) and explained that it had decided to nonrenew the parties' franchise relationship since it "ha[d] made a determination in good faith and in the normal course of business to sell the premises upon which the Facility is located." In the Notice, BPWCP also enclosed a copy of a summary statement of the PMPA and informed Greene that it would make him either a bona fide offer to purchase the Facility or offer him a right of first refusal ("ROFR") of a third party's offer if a third party offered to purchase the Facility.

While Greene disputes some of the proposed facts concerning the Notice, Greene's dispute merely provides Greene interpretation of this document and adds additional facts. Because Greene offers no evidence to show this is not what the Notice said, the court finds the facts about the Notice are undisputed. The court does note that Greene contends the Notice failed to comply with PMPA because it merely parroted the language of the PMPA and failed to adequately state the reasons for the nonrenewal. Greene also argues that contrary to what was written in the Notice, BPWCP was willing to continue a franchise relationship at the Facility because BPWCP eventually did renew

---

**1.** Greene offers no evidence to dispute this fact. Rather, Greene adds additional facts, which have been considered to the extent they are relevant.

the franchise relationship for an additional 15 years.

BPWCP engaged real state marketing company National Real Estate Clearinghouse, Inc., ("NRC") as its agent for the purpose of obtaining sealed bids for the Facility. Greene offers no evidence to refute this fact. Rather, Greene adds the additional facts that NRC was to obtain bids for both the Facility and the business/franchise and NRC had obtained bids in 2000 when a number of company operated facilities were sold.[2]

An independent third party offered to purchase BPWCP's interest in the Facility for $1 million and a one-percent buyer's premium of $10,000. Greene offers evidence showing that BPWCP did not only offer to sell its interest in the Facility. BPWCP also offered to sell the franchise if a third party bought the Facility. Greene offers evidence that the Facility itself had been appraised at $765,000, or $235,000 (31%) less than the $1 million offer.

BPWCP offered Greene a ROFR to the third party offer to purchase the Facility. BPWCP's ROFR to Greene to purchase the Facility was for the exact same $1 million purchase price as the offer from the third party. BPWCP's ROFR to Greene to purchase the Facility was on the same or better terms than the offer from the third party. Greene does not offer any evidence to dispute these facts, and he merely argues that no third party bidder would have offered to purchase the Facility alone for $1 million.

Greene provides evidence that historically when ARCO wanted to sell a property and keep it as an ARCO branded facility, ARCO would typically negotiate directly with the dealer to buy it in the normal course of business. Greene provides evidence that BPWCP had sold a number of company operated facilities, along with the relevant ARCO/am/pm franchises, in the same manner as was done in this case in 2000.

Greene provides evidence that as of February 2002, Greene's Facility was not identified as one of the facilities to be sold through the NRC bid process. It was actually identified as a facility to be sold directly to Greene rather than going through the NRC bid process.

Greene provides evidence that the third party's purchase of the Facility was conditioned upon the third party entering into a 15 year ARCO/am/pm franchise agreement. Greene argues this would allow BPWCP to sell his Franchise relationship when his current agreement expired.

Greene provides evidence that BPWCP provided prospective bidders and their lenders with confidential convenience store sales and gasoline volumes relative to the value of the business.

Greene provides evidence that BPWCP extended three ROFR offers to existing dealers in Nevada that were withdrawn and the bidders were not ready, willing, and able buyers. There is no evidence the bidder for the Facility, Parmod Kumar and his brother Anil Kumar ["the Kumars"], ever withdrew their bid or were not ready, willing, or able to buy the Facility. Greene also provides evidence that during the bidding process prospective buyers were prohibited from asking store employees or managers about the sale of a store. While Greene provides evidence other prospective buyers for other facilities may have violated this condition, Greene has not cited evidence showing that the Kumars violated this provision.

ARCO/am/pm franchises have a financial value.

2. Greene offers evidence about how BPWCP sold dealer owned dealer operated stations in 2000, and shows that BPWCP used a similar bidding process in these sales.

**994**

### B. Judicial Notice

Both BPWCP and Greene request the court take judicial notice of court filings in other cases. BPWCP requests the court take judicial notice of an order granting the plaintiff's motion for summary judgment in *BP West Coast Products LLC v. Jasbir S. Tung*, 02–1095 VAP (SGLx), an order granting the plaintiff's application for preliminary injunction in *BP West Coast Products LLC v. Jasbir S. Tung*, 02–1095 VAP (SGLx), the first amended complaint for damages in *RNR Oils, Inc., et al v. BP West Coast Products LLC, et al.*, BC295835 in the Los Angeles County Superior Court, the complaint filed in *Anand v. BPWCP West Coast PRODUCT LLC, et al.*, BC299575 in the Los Angeles County Superior Court, and the judgment, order on cross-motions for summary judgment, and statement of uncontroverted facts and conclusions of law in *Kohanteb v. Chevron Products Company and Chevron U.S.A., In.*, CV 00–02784 RSWL (Rcx). Greene asks that the court take judicial notice of the declaration of Jerome Thissen, and attached exhibits, filed in *BP West Coast Products LLC v. Jasbir S. Tung*, 02–1095 VAP (SGLx).

The court may take judicial notice of facts that are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Fed.R.Evid. 201(b); *United States v. Bernal–Obeso*, 989 F.2d 331, 333 (9th Cir.1993). Judicial notice may be taken of court records. *See Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236, 1239 (4th Cir.1989); *Mullis v. United States Bank. Ct.*, 828 F.2d 1385, 1388 n. 9 (9th Cir.1987); *Rodic v. Thistledown Racing Club, Inc.*, 615 F.2d 736, 738 (6th Cir.1980); *Valerio v. Boise Cascade Corp.*, 80 F.R.D. 626, 635 n. 1 (N.D.Cal.1978). As such, the court will take judicial notice of the opinions, complaints, briefs, and evidence filed in other actions. *See Egan v. Teets*, 251 F.2d 571, 578 (9th Cir.1957). However, as a general rule "a court may not take judicial notice of proceedings or records in another cause so as to supply, without formal introduction of evidence, facts essential to support a contention in a cause then before it." *M/V Am. Queen v. San Diego Marine Constr. Corp.*, 708 F.2d 1483, 1491 (9th Cir.1983). In resolving this motion, the court will not take judicial notice of these documents for the truth of the facts asserted. Rather, the court will only consider these documents to show that various contentions and arguments have been raised in other actions and review how other courts have addressed these issues.

### DISCUSSION

### A. PMPA Violations

BPWCP requests summary judgment on BPWCP's request for declaratory relief finding it did not violate the PMPA and on Greene's counterclaim for PMPA violations. BPWCP contends that the undisputed facts show BPWCP did not violate the PMPA when selling the facility. Greene contends summary judgment as a matter of law is not appropriate.

The PMPA governs when an oil company may terminate its franchise relationships. *See* 15 U.S.C. §§ 2801–2806. The Ninth Circuit has recognized that the chief purpose of the PMPA is to remedy the disparities in bargaining power between franchisees and franchisors in order to protect the franchisee's reasonable expectation of continuing the franchise relationship. *Unocal Corp. v. Kaabipour*, 177 F.3d 755, 762 (9th Cir.1999). However, the PMPA is not "a oneway statute, which should single-mindedly be construed to favor franchisee positions." *Id.* at 762–63. In enacting the PMPA Congress recognized franchisors needed adequate flexibility so that they could initiate changes in

their marketing activities to respond to changing market conditions and consumer preferences. *Id.* at 762. As such, the Ninth Circuit has recognized that major firms must retain the freedom to seek greater economic efficiency through corporate reorganizations, mergers, and acquisitions and requiring fixed business relationships may spell financial death to the detriment of franchisees as well as franchisors. *Id.* In addition, when enacting the PMPA, Congress desired a single uniform set of rules governing the grounds for termination and non-renewal of motor fuel marketing franchises. *Id.*

Title 15 U.S.C. § 2802 limits the situations in which a franchisor can decline to renew a franchise relationship. One ground for nonrenewal is if the franchisor in good faith and in the normal course of business decides to sell the premises. 15 U.S.C. § 2802(b)(3)(D)(i)(III). There are restrictions on termination because of a sale. The franchisor's determination cannot be made for the "purpose of converting the leased marketing premises to operation by employees or agents of the franchisor for such franchisor's own account." 15 U.S.C. § 2802(b)(3)(D)(ii). The franchisor must timely notify the existing franchisee of its decision. 15 U.S.C. § 2802(b)(3)(D)(2). In addition, within 90 days after notification is given pursuant to 15 U.S.C. § 2804, the franchisor must (I) make a "bona fide offer to sell, transfer, or assign to the franchisee such franchisor's interests in such premises;" or (II) if applicable, offer "the franchisee a right of first refusal of at least 45–days duration of an offer, made by another, to purchase such franchisor's interest in such premises." 15 U.S.C. § 2802(b)(3)(D)(iii).

### 1. Decision to Sell in Good Faith and the Normal Course of Business

 The PMPA requires that a franchisor make its decision to sell a facility "in good faith and the normal course of busi-

ness." The PMPA's good faith requirement looks to whether a franchisor's decision is a "sham determination" used as an artifice to terminate or nonrenew a franchise. *Beck Oil Co. v. Texaco Refining & Marketing, Inc.*, 25 F.3d 559, 561–62 (7th Cir.1994); *Ajir v. Exxon Corp.*, 1995 WL 261411, *2 (N.D.Cal.1995). "The good faith requirement looks to whether the franchisor's actions are designed to conceal selective discrimination against individual franchises." *Kaabipour*, 177 F.3d at 767. When determining whether a decision is in good faith, the court must keep in mind that Congress did not intend "judicial second-guessing of the economic decisions of franchisors." *Svela v. Union Oil Co. of Calif.*, 807 F.2d 1494, 1501 (9th Cir.1987). The court is not to review the objective reasonableness of the franchisor's actions or substitute the court's judgment for that of the franchisor in deciding whether to sell the a facility. *Coast Village, Inc. v. Equilon Enterprises, LLC*, 163 F.Supp.2d 1136, 1175 (C.D.Cal.2001). The test for determining good faith is subjective, and the court should look to the franchisor's intent rather than the effect of the franchisor's actions. *Svela*, 807 F.2d at 1501. In determining a franchisor's motive, the court may only review the franchisor's process and proven motive in deciding to sell the Facility. *See Coast Village, Inc. v. Equilon Enterprises, LLC*, 163 F.Supp.2d 1136, 1175 (C.D.Cal.2001). As long as the franchisor did not have discriminatory motive and there is no evidence the reasons given are not a pretext disguising an improper purpose, the court should find good faith. *Kaabipour*, 177 F.3d at 767; *Beck Oil*, 25 F.3d at 562; *Massey v. Exxon Corp.*, 942 F.2d 340, 344 (6th Cir.1991).

A franchisor meets the "normal course of business" requirement if the determination was the result of the franchisor's normal decision making process. *Beck Oil*, 25 F.3d at 562. "While Congress intended

the good faith test to prevent franchisors from shielding their decisions with artifice, the normal course of business element examines whether the franchisor made the choice through its usual decision-making process." *Sandlin v. Texaco Refining and Marketing Inc.*, 900 F.2d 1479, 1481 (10th Cir.1990).

On the record before the court, the court finds no disputed issue of fact on whether BPWCP's decision to sell the Facility was in good faith and in the normal course of business. BPWCP has provided evidence that BPWCP decided to sell the Facility as part of an annual evaluation of capital employed and market performance for its retail facilities in accordance with its overall business strategy. Greene does not specifically dispute BPWCP's evidence. However, Greene argues that BPWCP wanted to sell the Facility to keep the profits of both a sale of the real estate and improvements making up the Facility and continue to retain profits as the franchisor from the sale of gasoline and royalties from the ARCO/am/pm convenience store sales. Even if Greene is correct and BPWCP's motive was based in part to obtain money from an immediate sale and continue to receive money in the future from the franchise, the court does not find this an improper motive made in bad faith. Greene cites no law to support the proposition that a decision made for a franchisor's financial gain is in bad faith or not in the normal course of business. This court finds no violation of Section 2802(b)(3)(D)(I) merely because BPWCP made the decision to sell the Facility in part because it would be profitable.

In arguing BPWCP's decision was not in good faith and in the normal course of business, Greene points to the bidding system used by BPWCP. Greene argues that "it is not enough that BPWCP's decision to sell GREENE's premises by including it in the NRC bidding scheme be in good faith and in the normal course of business. The system set up by BPWCP to carry out such sale must be in good faith and in the normal course of business as well." Greene cites no support for this proposition. And, absent a requirement that the court must also review the bidding process in determining good faith and in the normal course of business, the court is not inclined to add this requirement. Section 2802(b)(3)(D) only requires that the "determination" to sell a facility be "made by the franchisor in good faith and in the normal course of business."

■ At best, evidence regarding impropriety in BPWCP's bidding process is circumstantial evidence that its underlying decision to sell the Facility was not in good faith and in the normal course of business. However, Greene has failed to provide sufficient evidence of irregularities regarding the sale of the Facility to support an inference that the underlying decision to sell was in bad faith and not in the normal course of business to refute BPWCP's evidence. Evidence that BPWCP had originally marked the Facility to be offered to Greene directly does not show an underlying theme of bad faith when BPWCP ultimately decided to allow bids on the Facility and the law clearly allowed the Facility to be sold through such a procedure. The fact other franchisees were given ROFR based on third party bids even though the third party was not willing and able to pay the bid does not show any bad faith on the part of BPWCP in this sale. There is no evidence the Kumars were not legitimate third party bidders who stood ready to pay the $1 million offer price if Greene declined his right of first refusal. There is also no evidence BPWCP allowed the Kumars to violate BPWCP's own rules regarding contact with people working at the Facility.

The only allegation of impropriety by BPWCP for which Greene has evidence is Greene's allegation that BPWCP provided potential bidders with the volume and sales history for the Facility. Alan Delisle and Even Gladstone stated that volume and sales history were given as part of the bidding process and the bid package included this information for the Facility. *See* Delisle Depo. at 128–29; Gladstone Depo. at 220 & Exhibit page 535. Delisle and Gladstone admitted that this information is generally considered confidential by BPWCP and they would be reluctant to disclose this information. *See* Delisle Depo. at 128–29; Gladstone Depo. at 220. Gladstone explained the information was confidentially given to bidders because it would help them value the businesses. *See* Gladestone Depo. at 222–23 & Exhibit page 535. The court agrees that providing this information may have given the bidders an incentive to bid high on Facilities that were profitable. However, Greene fails to provide the authority making BPWCP's conduct illegal or improper. The fact BPWCP generally considered this information confidential does not make the decision to give it to potential bidders improper. The court finds no evidence that the business decision to provide this information was inappropriate; the court would presume bidders would want this information when bidding to know an appropriate bid. The court simply does not find such conduct sufficient circumstantial evidence that the underlying decision to sell was in bad faith and not in the normal course of business to refute BPWCP's direct evidence to the contrary. Thus, the court finds no disputed issue of material fact on whether BPWCP made its decision to sell the Facility in good faith and in the normal course of business.

### 2. Notice

The PMPA requires a franchisor to notify an existing franchisee that a franchise will not be renewed at least ninety days before the nonrenewal takes effect. *See* 15 U.S.C. § 2902. Such notice shall be in writing and "shall be posted by certified mail or personally delivered to the franchisee." 15 U.S.C. § 2902(b)(1) & (2). The Notice must contain "a statement of intention to terminate the franchise or not to renew the franchise relationship, together with the reasons therefor." 15 U.S.C. § 2902(b)(3)(A).

BPWCP has provided evidence that on April 22, 2002, BPWCP notified Greene that it was considering selling its interests in the Facility and nonrenewing the parties' lease franchise relationship. On July 31, 2002, BPWCP notified Greene that it had decided to sell the Facility and nonrenew the franchise relationship. The Notice informed Greene that the franchise would not be renewed because "BPWCP ha[d] made a determination in good faith and in the normal course of business to sell the premises upon which the Facility is located."

■■■ Greene claims the Notice did not provide sufficient reasons for the termination. The court disagrees. The Notice clearly indicated that the franchise was not being renewed due to BPWCP's decision to sell the premises. Greene was informed of his rights to purchase the Facility. While the Notice was concise, the court finds it sufficient to have provided Greene with the reason for the nonrenewal.

Greene also argues that the Notice was incorrect because it stated BPWCP did not intend to renew the franchise, but in reality, once the Facility had been sold BPWCP did renew the franchise relationship. The court finds no merit to this argument. There is no evidence that at the time BPWCP wrote the Notice, BPWCP was in fact planning to renew the franchise. BPWCP wanted to sell the Facility, and BPWCP could not both promise

to renew Greene's franchise and sell the Facility because the Facility may have been sold to another buyer. Greene was also informed about his rights to purchase the Facility and of the terms under which BPWCP would give him a new franchise. Finally, the original franchise relationship Greene had with BPWCP did terminate. Greene now has a contract dealer franchise instead of a franchise as a lessee of the station. While in practical terms the two types of franchises may be similar, Greene has not shown a disputed issue of material fact that at the time BPWCP sent the letter BPWCP really intended to re-. new Greene's old franchise agreement.

### 3. Third Party Offer

Before selling a facility, a franchisor must give the franchisee an offer to purchase the facility. 15 U.S.C. § 2902(b)(3)(D)(iii). Section 2902(b)(3)(D)(iii) provides that in the case of a leased marketing premises, the franchisor must "either—(I) [make] a bona fide offer to sell, transfer, or assign to the franchisee such franchisor's interests in such premises; or (II) if applicable, [offer] the franchisee a right of first refusal of at least 45–days duration of an offer, made by another, to purchase such franchisor's interest in such premises." In this case, BPWCP followed the second option and offered Greene the right of first refusal to purchase the Facility.

■ Greene appears to contend that the $1 million third party offer was not a valid third party offer because of various improper conduct that occurred during the bidding process. First, Greene provides evidence concerning third party bidders and bids for facilities in Nevada. Greene offers evidence that third party offers were used in these sales even though the third party was not able and willing to buy the facility at the time the offer was given to franchisee. The court finds this evi-

dence has no relevance to whether the third party offer Greene was given was legitimate. There is no evidence the Kumar Partnership did not have adequate financing or had withdrawn their bid by the time it was offered to Greene. Thus, the court finds evidence concerning BPWCP's sale of other facilities does not create a disputed issue of material fact on whether the offer given to Greene was legitimate.

Second, Greene contends that the $1 million third party purchase price was inflated by the bidding process. Greene cites to the evidence showing BPWCP provided confidential sales information. As discussed above, the court does not find providing this information was improper and illegally inflated the price of the Facility. While BPWCP considered the information confidential, Greene has cited no authority for the proposition it was inappropriate for BPWCP to confidentially provide this information to bidders, and the court finds such information would have been helpful to potential bidders to make the bidding process as informative as possible. The court finds nothing in the PMPA prohibits a third party from receiving information about potential future profits.

Third, Greene contends he was required to pay for more than the fair market value of the Facility because the third party bid included other arrangements. Greene provides evidence from an appraiser who has appraised the Facility at only $765,000. Greene takes the position that he should not have had to pay the third party purchase price because BPWCP had offered to also sell the ARCO/am/pm franchise if a third party bought the Facility. In other words, Greene claims the $1 million was for more than the Facility because it included the promise to purchase the ARCO/am/pm franchise in the future. Greene

argues that without the promise of the franchise, third party bidders would likely not bid such a large sum.

"[B]idders routinely come to the table with different hands." *Keener v. Exxon Company, U.S.A.*, 32 F.3d 127, 132 (4th Cir.1994). A prospective buyer who does not currently have a franchise would come to the table with different needs than a prospective buyer who already has a franchise and is currently leasing a facility for sale. This does not make that third party's offer for the particular site any less legitimate. "An actual price, agreed to by a willing buyer and a willing seller, is the most accurate gauge of the value the market places on a good." *Id.* 32 F.3d at 132. That price is a measure of what the station is worth to a purchaser in the third party's position. The court can infer that such an amount represents the value of the facility. *Ellis v. Mobil Oil*, 969 F.2d 784, 786 (9th Cir.1992). The presumption of validity to third party bids "comports with the desire not to transform a simple statutory requirement into a complex and cumbersome one necessitating a detailed economic analysis of private sector decisions." *Keener*, 32 F.3d at 131.

Case law refutes the argument that a third party offer does not comply with Section 2902(b)(3)(D)(iii)(II) if the deal given to the third party differs from the exact arrangement offered to the franchisee. For example, in *Arnold v. Amoco Oil Co.*, 872 F.Supp. 1493 (W.D.Va.1995), a franchisor offered the franchisee a right of first refusal on a third party's offer to buy facilities. The third party had also bid on other facilities and the arraignment with the third party included an accompanying offer for a supply agreement. *Id.* at 1496–99. The franchisor only offered to sell the franchisee two of the facilities and offered no supply agreement. *Id.* at 1500 & n. 6. The court found such a practice acceptable because each facility had been assigned a specific price by the third party and despite the fact the third party's offer included promises of other offers. *Id.* at 1500.

In *Keener v. Exxon Company, U.S.A.*, 32 F.3d 127 (4th Cir.1994), the Fourth Circuit Court of Appeals reviewed the propriety under the PMPA of Exxon's non-renewal of a franchise and offer to sell a station at the same price bid by a third party. The franchisee had operated a station in West Virginia which Exxon decided to sell as part of its plan to phase out the use of dealer-operated stations and convert to distributor-owned sites. *Id.* at 129. Exxon notified Keener of a third party bid and gave Keener a right of first refusal. *Id.* Although Keener chose not to match the third party bid, he protested the terms of the offer and filed suit seeking sale of the property at its fair market value. *Id.* Keener argued that Exxon had not made a valid offer under the PMPA to him because the third party offer included a promise by Exxon to supply the third party with a supply of gasoline, which he was not offered. *Id.* at 132–33. In rejecting his argument and finding that Keener could have availed himself of an opportunity to assure a similar allotment of gasoline from Exxon, the court emphasized that evidence that the franchisor offered the franchisee the station at the same price offered by a third party creates a strong presumption of statutory compliance. *Id.* In addition, the court did not find the fact the plaintiff's evidence showed the facility was worth $547,000 and the facility sold for $1,200,010 raised a triable question as to whether the PMPA's right to first refusal provision had been violated. *Id.* at 132. The court reasoned a fair market value is abstract and speculative and an "actual price, agreed to by a willing buyer and a willing seller, is the most accurate gauge of the value the market places on a good." *Id.* Thus, the court held that Keener's assertions failed to raise a triable issue of

fact as to Exxon's compliance with the right of first refusal provision of the PMPA. *Id.* at 132–33.

In *Ballis v. Mobil Oil,* 622 F.Supp. 473 (D.C.Ill.1985), the plaintiff was given the right of first refusal on a station. The plaintiff contended that the PMPA required Mobil to sell him the franchise at a fair and reasonable price notwithstanding a higher offer from the third party. *Id.* at 474. The court rejected the argument that Mobil had to take a $110,000 loss because the plaintiff wished to purchase the station for less than the third party. *Id.* at 475. The court reasoned that Mobil only needed to give the plaintiff the right to match a third party purchaser's offer, but was not obligated to give any special price discounts. *Id.* There was no argument in *Ballis* that the $110,000 difference between the third party offer and what the plaintiff believed was a bona fide offer was for the facility's "goodwill" or for some promise of a franchise to sell gas in the future. However, *Ballis* provides authority that a third party offer can be higher than what the franchisee believes is a fair market value.

The plaintiff in *Lee v. Exxon,* 867 F.Supp. 365 (D.S.C.1994), purchased the facility after the defendant had received a bid from a third party and provided the plaintiff with his right of first refusal. *Id.* at 366. The plaintiff sought to reform the sale alleging that Exxon had sold goodwill belonging to him because the third party's bid was higher than what the plaintiff believed was the market value for the facility. *Id.* at 368. The court disagreed and found that not only had the plaintiff failed to provide any evidence to support his claim that goodwill attached to the premises, but a goodwill theory is not a recognized basis to vitiate or reform a sale. *Id.* at 368.

Based on this case authority, the court finds the fact the third party bid may have included a promise or understanding that the third party would be given a franchise in the future does not make the third party bid violate the PMPA. This is not the case where the deal between the third party and BPWCP included the purchase of the Facility and the franchise. Arguably, if the $1 million had included a license to operate the Facility as an ARCO-branded facility and the ARCO/am/pm franchise, this purchase price included more than the Facility alone. However, BPWCP provides evidence that bidders such as the Kumars were told they were not purchasing the existing franchises. Gladstone Decl. ¶ 9. The Facility alone was sold, and the successful bidder would need to reach its own franchise agreement with BPWCP. Gladstone Decl. Exhibit B. Greene offers no evidence to show that the bid by the Kumars included the franchise. Greene is correct that the bid from the Kumars' included an understanding that they would be given the right to enter into an agreement with BPWCP for the franchise and licenses. However, not only was Greene given this option, but Greene was given even further options. If Greene choose to buy the Franchise, Greene, just like the Kumars, was given the option of entering into a "contract dealer franchise relationship for fifteen years." In addition, Greene, was given the option of continuing to operate under his existing franchise agreement until the end of the term, at which time he could debrand and sell other gasoline. *See* BPWCP's Amended Complaint Exhibit E. In light of the above cases, the court does not find that because the third party offer included something different than offered to Greene, the third party offer is not legitimate.

Greene relies on *Ellis v. Mobil Oil,* 969 F.2d 784 (9th Cir.1992), for the proposition that a third party offer that includes other factors is not allowed by Section 2802(b)(3)(D)(iii)(II), and in such a circum-

stance, a bona fide offer must be given. The plaintiff in *Ellis*, like Greene, operated a Mobil gasoline service station in Arizona as a lessee. *Id.* at 785. Mobil negotiated with Union Oil Company of California for the exchange of six Union Oil stations in Florida for eight Mobil stations in California and Arizona. *Id.* Mobil offered the plaintiff a right of first refusal on his station by offering to sell the station for $581,000, which was the value Union Oil internally placed on the station for the purposes of the exchange. *Id.* The Ninth Circuit stated as follows regarding the legitimacy of the third party offer.

> When a third party's offer is in the form of a single transaction for cash, the court can justifiably infer that the amount of an arms' length offer represents the value of the station. On such facts, all a franchisee is entitled to is the right of first refusal. *See Ballis v. Mobil Oil Corp.*, 622 F.Supp. 473, 475 (N.D.Ill. 1985). With an exchange agreement, one can infer from the fact that a transaction takes place that the exchanged items are of equal value, but the monetary value of the exchanged items is not necessarily apparent from the face of the transaction. If the exchange involves multiple properties, as in the present case, a stranger to the exchange would not necessarily know either the value of the entire package, or the value of any one of the independent components.

*Ellis*, 969 F.2d at 786. Because the third party offer was for numerous stations, the Ninth Circuit found the $581,000 third party offer was not a true third party offer. Besides the package nature of the third party offer for numerous stations, the Ninth Circuit noted some of the stations

had been valued at zero for the purposes of the exchange agreement, which would have inflated the internal valuation of the plaintiff's station. *Id.* The Ninth Circuit concluded that because the right of first refusal was not applicable, Mobil was obligated to extend the plaintiff a bona fide offer. *Id.* The Ninth Circuit found that a bona fide offer would reflect what a willing purchaser would pay for the fee title of the land, the improvements, and equipment, and such a "bona fide offer in this case would not include the value of the franchisee's own goodwill or Mobil's franchise value of the station." *Id.* at 788. The Ninth Circuit remanded to determine if the offer made by Mobil was bona fide. *Id.*[3]

Contrary to Greene's position, The Ninth Circuit did not find the third party offer invalid because it included the value of "independent components." Rather, the court refused to allow Mobil to proceed as a third party offer because the offer involved multiple facilities and it was impossible to determine the value of any one of them. The court finds such an offer different than the one made by the Kumars in this case. The Kumars' offer was for only one facility. Greene's position is that since an appraiser valued the property for less than the $1 million offer, the offer "must have" included some other component. Greene claims this component was the promise to give the Kumars a license and franchise in the future. The court finds this situation not prohibited by *Ellis*. The purpose behind allowing a third party's offer instead of a bona fide offer is that the court can infer that the amount of an arms' length offer represents the value of the station. That a third party may have considered future business opportuni-

---

3. Congress' use of the term "bona fide" rather than "fair market value" in the statute indicates a recognition that the word value almost always involves a conjecture, a guess, a prediction, a prophecy. *Slatky v. Amoco Oil Co.*, 830 F.2d 476, 485 (3d Cir.1987). "[T]here is no universally infallible index of fair market value." *Id.*

ties when giving a third party offer does not make the third party offer invalid. In this case, Greene provided no evidence of what the Kumars considered in making their bid. While the Kumars were promised a future franchise if they bought the property, as discussed above, Greene was given the same promise. Thus, the court cannot find that the Kumars' third party offer included such different components as the offer given to Greene that the court cannot find it to be a legitimate third party offer.

Fourth, Greene contends that there was impropriety in the bidding process. The court finds no evidence that the Kumars' bid was not the result of an arms length negotiation. BPWCP has provided evidence that it engaged a real estate marketing company to obtain sealed bids for the Facility. There is no evidence the Kumars did not follow the arranged bidding process. There is no evidence the bidding process was not open to others or that the Kumars received inside information not given to other bidders. There is no evidence the Kumars were not ready and willing to pay the $1 million if Greene decided not to purchase the Facility. There is no evidence the Kumars' offer for the Facility was a sham, tainted by fraud or that the Kumars and BPWCP were colluding to cause an arbitrary termination of Greene's franchise. Simply put, there is no evidence showing the $1 million bid by the Kumars was not the result of an arms length negotiation.

Fifth, related to Greene's argument that the $1 million included a separate promise regarding the ARCO/am/pm franchise, Greene contends that the $1 million included Greene's goodwill in the facility. Greene has provided evidence from one appraiser who appraised the facility at $765,000. However, the court finds this appraisal does not create a dispute issue of fact regarding the legitimacy of the third

party offer in light of the fact there is direct evidence of the property's market value— that is, the price a third party offered for the Facility. Given there is no evidence of impropriety surrounding the Kumars' bid or evidence the bid did not represent an arms length negotiation, the court finds the court can infer the bid represented a reasonable market price. The difference between Greene's evidence of the facility's value and the third party's offer are not nearly as great as there was in *Keener*, and the court does not find the differences substantial. Thus, the court finds no violation of the PMPA.

In this case, the evidence is undisputed that BPWCP exercised its rights to sell the Facility on a good faith business decision in the normal course of business. The undisputed evidence also shows that BPWCP's written offer and subsequent correspondence complied with the requirements of 15 U.S.C. § 2802(b)(3)(D)(iii). The offer which Greene accepted was the same offer extended to Exxon by a third party operating under normal market forces. As the Keener court observed, "An actual price, agreed to by a willing buyer and a willing seller, is the most accurate gauge of the value the market places on a good. Until such an exchange occurs, the market value of an item is necessarily speculative." *Keener*, 32 F.3d at 132. Greene has failed to come forward with evidence sufficient to overcome the statutory presumption as to the propriety of this transaction. Nothing written in the bid from the Kumars included the value of the Facility's goodwill. A franchisee only has "the right to match" the terms of the contract between the franchisor and the prospective buyer, and the franchisee is not entitled to any special price. *Ballis*, 622 F.Supp. at 475. Greene was afforded that opportunity here. As such, the right of first refusal was adequate. Accordingly, the court finds summary judgment in

favor of BPWCP appropriate on the PMPA claims.

## B. Remaining State Law Claim

The remaining claim in this action is Greene's state law claim brought under California Business and Professions Code § 17200. BPWCP contends that this claim is preempted by the PMPA. If the court finds the PMPA does not preempt this claim, BPWCP asks that the court decline to exercise jurisdiction over this claim because it is currently being litigated in a state court action.

■ "[P]endant jurisdiction is a doctrine of discretion not of plaintiff's right. Its justification lies in considerations of judicial economy, convenience and fairness to the litigants; if these are not present, a federal court should hesitate to exercise jurisdiction over state claims." *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). In *Nishimoto v. Federman–Bachrach & Associates,* 903 F.2d 709, 715 (9th Cir.1990), the Ninth Circuit made clear that once no federal claims remain in a given case, it is within the discretion of the district court to determine whether to dismiss the remaining claims. The court may decline to exercise supplemental jurisdiction over state claims when the federal claims are dismissed before trial. *See* 28 U.S.C. § 1367(c)(3); *Gibbs,* 383 U.S. at 726, 86 S.Ct. 1130.

In this case, the federal claims brought under the PMPA have been resolved. The remaining state claim in this action con-

cerns unfair business practices. Defining this standard in regard to selling gas stations is of importance to the people of this state. This court has yet to expend significant resources to resolve Greene's Section 17200 claim, and the court has never even considered the merits of the Section 17200 claim. The essential basis of Greene's Section 172000 is already pending in a state court action before the state court. The court will, therefore, decline to exercise its pendant jurisdiction and dismiss the remaining claim without prejudice.[4]

The court notes that in Greene's opposition he discusses BPWCP's alleged violation of California Business and Professions Code § 20999.25. Greene claims he should have received an offer to purchase the Facility under this provision prior to BPWCP's Notice. Such a claim is not currently before this court. It appears Greene has raised this claim in two related state court actions. Because this claim is not in the current action, the court will not address Greene's allegations. In addition, for the reasons discussed above, the court will decline to exercise supplemental jurisdiction over such a claim in the event Greene moves to amend his counterclaim.

## ORDER

Accordingly, for the reasons stated in the above memorandum opinion, the court ORDERS that:

1. BPWCP's motion for summary judgment is GRANTED;

---

4. Because the court declines to exercise jurisdiction over the remaining Section 17200 claim, it is unnecessary to determine if it is also preempted by the PMPA. The Ninth Circuit takes a restrictive approach to preemption under the PMPA. The Ninth Circuit limits the scope of preemption to those state laws that regulate the grounds for, procedures for, and notification requirements of termination or nonrenewal. *See, e.g., Unocal Corp. v. Kaa-*

*bipour,* 177 F.3d 755 (9th Cir.1999); *see also O'Shea v. Amoco Oil Co.,* 886 F.2d 584 (3rd Cir.1989); *Bellmore v. Mobil Oil Corp.,* 783 F.2d 300, 304 (2d Cir.1986). State law that "only incidentally affect franchise termination or nonrenewal" are not preempted. *Kaabipour,* 177 F.3d at 768. Given this standard, it is unclear whether Greene's Section 17200 claim based on the totality of Greene's conduct in selling the Facility is preempted.

2. BPWCP is GRANTED summary judgment on BPWCP's declaratory relief action because BPWCP did not violate the PMPA;

3. BPWCP is GRANTED summary judgment on Greene's counterclaim because BPWCP did not violate the PMPA;

4. The court DECLINES to exercise jurisdiction over the remaining state law claim; and

5. Greene's state law claim is DISMISSED WITHOUT PREJUDICE to refiling in state court