32 F.3d 127
 Alston R. KEENER, Plaintiff-Appellant,
v.
EXXON COMPANY, USA, a foreign corporation; Exxon
Corporation, a foreign corporation, Defendants-Appellees,
and
Alan Enterprizes, a West Virginia Limited Liability Company;
Joe DeFazio Oil Company, a West Virginia Corporation;
Joseph A. DeFazio, individually and as organizing partner
number one of Alan Enterprizes, a West Virginia Limited
Liability Company; Joseph DeFazio, individually and as
organizing partner number two of Alan Enterprizes, a West
Virginia Limited Liability Company, Defendants.
 No. 94-1142.
 United States Court of Appeals,
Fourth Circuit.
 Argued June 6, 1994.
Decided Aug. 15, 1994.
 
 ARGUED: Thomas Matthew Wilson, III, Tydings & Rosenberg, Baltimore, MD, for appellant. Gaspare Joseph Bono, Howrey & Simon, Washington, DC, for appellees. ON BRIEF: Lynn A. Kohen, Tydings & Rosenberg, Baltimore, MD, Paul Cranston, Morgantown, WV, for appellant. Robert G. Abrams, Robert E. Leidenheimer, Jr., Howrey & Simon, Washington, DC, for appellees.
 Before MURNAGHAN, WILKINSON, and WILKINS, Circuit Judges.
 Affirmed by published opinion. Judge WILKINSON wrote the majority opinion, in which Judge WILKINS joined. Judge MURNAGHAN wrote a dissenting opinion.
 OPINION
 WILKINSON, Circuit Judge:
 
 
 1
 The question in this case is whether a gasoline station franchisee had an opportunity to exercise a valid right of first refusal as established by the Petroleum Marketing Practices Act ("PMPA"). See 15 U.S.C. Secs. 2801-2806. Under the Act, a franchisor desiring to sell a station operated by a franchisee must either make a bona fide offer of sale to the franchisee or give the franchisee an opportunity to buy the station on the same terms as a third party offer. See 15 U.S.C. Sec. 2802(b)(3)(D)(iii). Here, the franchisor pursued the second route and offered the franchisee the station at the same price bid by a third party. This fact creates a strong presumption that a valid right of first refusal was extended. Because plaintiff's evidence is insufficient to overcome that presumption, we affirm the district court's decision that the franchisor complied with the PMPA's right of first refusal provision.
 
 I.
 
 2
 In 1984, Exxon began construction of a service station in Morgantown, West Virginia. After the station was completed, it was leased to Alston Keener as Exxon's dealer-franchisee. Under the agreement with Exxon, Keener paid monthly rent and the costs of the gasoline he purchased from Exxon. The franchise was a profitable one, and the two parties signed a lease renewal in November 1988. The new lease was scheduled to run until March 1, 1992.
 
 
 3
 In 1991, Exxon began considering ways to improve the efficiency of its gasoline supply system. As part of that plan, Exxon decided it would phase out the use of dealer-operated stations in certain markets and sell those station sites to Exxon's independent distributors.[1] One of the markets selected for the new system included the Morgantown area. Exxon determined that part of the new strategy required sale of the station leased by Keener. It thus notified Keener on September 26, 1991 that his lease would not be renewed.
 
 
 4
 Exxon, following the procedures it had established for the sale of stations, solicited bids for the purchase of Keener's station from six Exxon-brand distributors in the region. The solicitations informed bidders that the minimum acceptable price was $547,000 and that Exxon would require an option to repurchase the station if the site ceased selling Exxon-brand gasoline at any time over the next twenty-one years. Three distributors ultimately bid on the station, with the high bid of $1,200,010 coming from Joe DeFazio Oil Company. Keener was notified of this bid on December 17, 1991, and offered a right of first refusal pursuant to 15 U.S.C. Sec. 2802(b)(3)(D)(iii)(II). Exxon explained that Keener would have sixty days to purchase the station at the same price as DeFazio had bid. Exxon also told Keener that he would not be required to provide Exxon with the option agreement.
 
 
 5
 Keener then began negotiations with several other Exxon distributors in the area to determine whether they would provide him with Exxon products should he decide to purchase the station. Both Clements Oil Company and Hess Oil Company offered to sell Keener Exxon gasoline. However, Keener did not choose to match DeFazio's price. Instead, Keener asked Exxon to sell him the station at its "fair market value." Exxon declined, and sold the station premises to DeFazio.
 
 
 6
 Keener subsequently filed suit in West Virginia state court. The suit was removed to federal district court in West Virginia and then transferred with the parties' consent to federal district court in Maryland. Keener contended that the right of first refusal contained in 15 U.S.C. Sec. 2802(b)(3)(D)(iii)(II) of the PMPA meant that he was entitled to buy the same thing DeFazio Oil bid on at the same price DeFazio Oil offered. Exxon had not honored that entitlement, he claimed, because DeFazio Oil had bid on the station with the extra advantage of Exxon's promise to provide DeFazio Oil with a supply of gasoline. Because he was not actually being offered the same thing DeFazio Oil had bid on, Keener claimed, Exxon's actions violated the PMPA. Keener therefore requested that the court either (1) order DeFazio Oil to transfer the station to Keener for the asserted "fair market value" of $547,000, or (2) find Exxon liable for $653,010, the difference between $547,000 and the price DeFazio paid.
 
 
 7
 The district court rejected Keener's argument and granted summary judgment for Exxon. Contrary to Keener's claim, the district court found that he had, in fact, been offered the opportunity to purchase Exxon's interest in the property on the same terms as DeFazio. Indeed, the court concluded that because Keener did not have to provide Exxon with the repurchase option, "[t]he deal offered to Keener was thus more advantageous" than that offered to other bidders. The district court also noted that Keener could have continued to operate the premises as an Exxon station if he had matched the DeFazio Oil offer and then bought gasoline from an Exxon distributor. Once Keener declined to exercise his right to match the DeFazio Oil bid, the district court concluded, Exxon acted appropriately under the PMPA in selling the station to DeFazio.
 
 
 8
 Keener now appeals.
 
 II.
 
 9
 The PMPA itself contains no statement of legislative purpose, but the background of its passage has left that purpose clear. There was much concern expressed that franchisors had used the threat of franchise termination to impose harsh conditions upon the business operations of franchisees. See S.Rep. No. 95-731, 95th Cong., 2d Sess. 17-19 (1978), reprinted in 1978 U.S.C.C.A.N. 873, 875-77. The Act did not create absolute protection for franchisees, however; it established only "minimum Federal standards governing the termination and nonrenewal of franchise relationships for the sale of motor fuel by the franchisor or supplier of such fuel." 1978 U.S.C.C.A.N. at 873; see Tobias v. Shell Oil Co., 782 F.2d 1172, 1174 (4th Cir.1986).
 
 
 10
 The establishment of only minimal standards was motivated in part by the desire to limit federal intrusion into the property rights of the franchisor. See Valentine v. Mobil Oil Corp., 789 F.2d 1388, 1391 (9th Cir.1986). Similarly, the Act intended to preserve the "flexibility" of petroleum delivery markets. 1978 U.S.C.C.A.N. at 877; Slatky v. Amoco Oil Co., 830 F.2d 476, 486-87 (3d Cir.1987); Radecki v. Amoco Oil Co., 634 F.Supp. 1393, 1401 (D. Minn.1986). Congress understood that an industry driven by national and international market forces faces rapidly changing conditions. Such market uncertainties underscored the need for the petroleum industry to retain maximum economic efficiency in all areas, including the delivery of gasoline to individual consumers. See 1978 U.S.C.C.A.N. at 877 (noting the importance of preserving franchisor ability to respond to "changing market conditions"); see also May-Som Gulf, Inc. v. Chevron U.S.A., Inc., 869 F.2d 917, 921 (6th Cir.1989).
 
 
 11
 The PMPA preserves the flexibility of petroleum delivery markets by ensuring that sound business judgment does not become a casualty of constant judicial oversight. See Valentine, 789 F.2d at 1392 n. 7. Section 2802(b)(3)(D)(iii), the provision at issue here, demonstrates the point. Once a franchisor makes the determination not to renew a franchise and sell the franchise station, the franchisor has two options. It may either make the franchisee a "bona fide offer to sell" the station, or it may provide the franchisee with a "right of first refusal" at a price offered by a third party buyer.[2] Providing the franchisor this choice demonstrates the statute's flexibility; more importantly, both options included in Sec. 2802(b)(3)(D)(iii) fully reserve the price determining function to market actors.
 
 III.
 
 12
 In the case before us, Exxon made a business judgment that its distributors were in the best position to efficiently deliver company products to the consumer, and the value of the station was determined by competitive bidding among those distributors. Keener, of course, did not disappear from the picture: once DeFazio extended the $1,200,010 bid, Exxon gave Keener the opportunity to purchase the station at that price. See 15 U.S.C. Sec. 2802(b)(3)(D)(iii)(II). Instead of exercising this right of first refusal, Keener chose to challenge the propriety of Exxon's actions through litigation.
 
 
 13
 Keener's challenge rests on the assertion that the property Exxon offered him somehow differed from what DeFazio Oil had offered to buy. The fact that Exxon offered Keener the service station at the same price DeFazio Oil had bid, however, creates the strong presumption that Exxon fulfilled its right of first refusal obligation under Sec. 2802(b)(3)(D)(iii)(II). This presumption that a same price offer evidences statutory compliance reflects the recognition that claims such as Keener's intrude upon normal business operations once filed. Indeed, Keener's suit, by calling into question DeFazio Oil's continued operation of the station, can only have made it more difficult for DeFazio to manage its business affairs. Such a result, of course, is disruptive of the market efficiency the PMPA sought to maintain. Accordingly, early resolution of claims is of special significance in the PMPA context, and a presumption of statutory compliance where Exxon offered the same station for the same price facilitates that end. The presumption also comports with the desire not to transform a simple statutory requirement into a complex and cumbersome one necessitating a detailed economic analysis of private sector decisions. See Hinkleman v. Shell Oil Co., 962 F.2d 372, 377 (4th Cir.1992) (per curiam). It remains only to determine whether Keener has made a sufficient showing to create a triable issue of fact in the face of that presumption.[3]
 
 IV.
 A.
 
 14
 Keener asserts that Exxon sold DeFazio Oil both a gasoline supply commitment and the station proper, whereas Exxon offered him only the opportunity to buy the station. This position finds only minimal support in the record. There is, of course, evidence that Exxon planned to, and ultimately did, increase the gasoline supply to the distributor who purchased the station. This evidence does not mean, however, that the purchase of the station entitled DeFazio Oil to the increased allotment. DeFazio Oil still had to apply separately for the increased allotment to supply the station.[4] If its distributorship were terminated, its right to purchase gasoline from Exxon for the station would end. In this respect, DeFazio's position bore a substantial similarity to that of Keener. Keener had every opportunity to assure a similar allotment of Exxon gasoline for himself by signing a contract with one of two Exxon distributors that offered to supply him if he purchased the station. Whatever points Keener wishes to make with respect to DeFazio's relationship with Exxon are thus significantly blunted by his own ability to secure supplies of Exxon gasoline.
 
 
 15
 Keener's real complaint is that DeFazio Oil had some sort of unfair advantage in the bargaining process by being able to deal directly with Exxon. Whatever advantage DeFazio Oil may have had, however, resulted from its preexisting distributor relationship with Exxon, not from the contract for sale of the station. Because DeFazio Oil already routinely purchased and distributed Exxon gasoline in the region, it was a relatively simple matter for the company to expand its existing distribution contract requirements with Exxon to accommodate the increased gasoline supply it would need to operate the station. Such advantages are in no sense impermissible; the PMPA does not prohibit the sale of stations to distributors, and federal courts are not in the business of equalizing all advantages on the market's playing field. It also should not be forgotten that DeFazio's position as a distributor caused him some harm as well. It is undisputed that Keener did not have to provide Exxon with the repurchase option that all the distributors bidding on the station were required to accept. As a result, Keener had the advantage of being offered the station unencumbered by any contractual restrictions. The point here is that bidders routinely come to the table with different hands, and Keener can make no claim based on the fact that DeFazio Oil's preexisting commercial relationships gave it certain advantages in setting up an Exxon franchise at the station site.
 
 B.
 
 16
 Keener also argues that the price DeFazio Oil paid demonstrates that more than just the station was at stake. He notes that Exxon initially appraised the station at $370,000 and ultimately approved a minimum sale price of $547,000. From these facts, Keener concludes that $547,000 is the value of the station alone, and argues that the discrepancy between this figure and the $1,200,010 DeFazio Oil paid can only be explained by the fact that DeFazio also purchased a guaranteed supply of Exxon gasoline.
 
 
 17
 This position suffers from several infirmities. To begin with, Keener downplays the fact $547,000 was simply the minimum acceptable price Exxon set for the station. This price thus represents nothing more than a floor on the bidding process. It is not necessarily Exxon's valuation of what it believed the station was likely to bring on the market.
 
 
 18
 More importantly, Keener's position reflects the belief that fair market value can most accurately be calculated in the abstract. However, fair market value is, by necessity, best set by the market itself. An actual price, agreed to by a willing buyer and a willing seller, is the most accurate gauge of the value the market places on a good. Until such an exchange occurs, the market value of an item is necessarily speculative. See Amerada Hess Corp. v. Commissioner of Internal Revenue, 517 F.2d 75, 83 (3d Cir.1975). Here, the only such agreed upon price was the $1,200,010 bid that DeFazio Oil made. That price is a measure of what the station was worth to a distributor in DeFazio's position.[5] The fact that a final bid turns out to be higher than the level at which the bidding opens is not just endemic to the bidding process, but the commercially reasonable hope of every offeror. As a PMPA offeror, Exxon was entitled to seek the best purchase price that it could find for its property. The fact that it received such a price does nothing to strengthen plaintiff's case.
 
 V.
 
 19
 Keener's assertions thus fail to raise a triable question as to whether Exxon has complied with the PMPA's right of first refusal provision. This conclusion is strengthened by the fact that Keener has never sought a form of relief consonant with his stated injury. He has never offered to match DeFazio's bid. Instead, Keener has sought a court order mandating the transfer of the station to him for the $547,000 price floor set by Exxon, or damages based on the difference between the $547,000 price and the price DeFazio bid. Both these remedies would allow Keener to capture an unacceptable windfall based on an erroneous fair market valuation. See Ballis v. Mobil Oil Corp., 622 F.Supp. 473, 476 (N.D. Ill.1985). We cannot accept the view that the protection of franchisees under the PMPA requires any such bonanza, particularly where the franchisor has done nothing more than get the best value it could for its property.
 
 
 20
 For the foregoing reasons, the judgment of the district court is
 
 
 21
 AFFIRMED.
 
 
 22
 MURNAGHAN, Circuit Judge, dissenting.
 
 
 23
 The sole issue on appeal is whether the terms of Exxon's offer to Keener were identical to the terms of DeFazio Oil's offer to Exxon. See Razavi v. Amoco Oil Co., 833 F.Supp. 1, 8 (D.D.C.1993) (stating that the "right of first refusal" provision of the Petroleum Marketing Practices Act (PMPA), 15 U.S.C. Sec. 2802(b)(3)(D)(iii)(II), obliges a franchisor to offer to sell its gasoline station to the franchisee "on terms identical to those the [franchisor] has received from another" (emphasis added)); Ellis v. Mobil Oil Corp., 708 F.Supp. 1094, 1096 (D. Ariz.1989) (same), aff'd in relevant part, 969 F.2d 784 (9th Cir.1992); see also Atlantic Ave. Oil & Gas Ltd. v. Texaco Ref. & Mktg., Inc., 699 F.Supp. 27, 31 (E.D.N.Y.1988) ("A right of first refusal is a right to buy on the same terms offered by a third party." (emphasis added)), aff'd, 870 F.2d 93 (2d Cir.1989).
 
 
 24
 On appeal from the entry of summary judgment, we must construe the terms of the offers by viewing all of the record evidence, and all reasonable inferences that may be drawn therefrom, in the light most favorable to Keener, the party opposing summary judgment. See Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir.1979). As the franchisor, Exxon bears the burden of going forward with evidence to establish that the terms of the two offers were identical. See 15 U.S.C. Sec. 2805(c).
 
 
 25
 Under the terms of DeFazio Oil's offer to Exxon, DeFazio Oil gave Exxon (1) $1.2 million, and (2) an option to repurchase the service station if it ceased to be used to sell Exxon-brand motor fuel at any time in the next twenty-one years. Exxon gave DeFazio Oil (1) the station, (2) the right to display Exxon's trademark at the station, and (3) the right to purchase a sufficient supply of Exxon-brand motor fuel, at the relatively low "rack" price, to meet the station's needs (i.e., approximately 1.7 million gallons of fuel per year).
 
 
 26
 The terms of Exxon's offer to Keener were much simpler: Keener would have to have given Exxon $1.2 million and Exxon would had to have given Keener the station. Clearly, the express terms of the two offers were not identical. As an example, the promise of a sufficient supply of Exxon-brand motor fuel at the "rack" price was not to be given.
 
 
 27
 Furthermore, Exxon has pointed to nothing in the record to suggest that the value of the repurchase option equalled the sum of the values of the trademark agreement and the gasoline supply commitment. Indeed, there is evidence to the contrary. Purchasing from an Exxon distributor (who would himself first purchase at the "rack" price) instead of from Exxon itself is obviously less advantageous since some additional profit would be due to the distributor. Thus, the Court has no basis for holding that the two offers were equivalent, either in their express language or in their economic worth. Therefore, I would vacate the grant of summary judgment and remand the case to the district court.
 
 
 28
 The majority avoids that result by creating out of whole cloth a "strong presumption" that, whenever two offers contain the same purchase price, a valid right of first refusal has been extended--regardless of whether the same items were being purchased at that price. The majority's "strong presumption" finds no support in the plain language of the PMPA or in the case law interpreting that statute. Furthermore, it makes no sense to presume that an offer to buy several valuable property interests (e.g., a station plus the right to use a trademark plus the right to distribute a supply of fuel) and an offer to buy only one of those interests (e.g., a station) are "identical" merely because the dollar amounts contained in the bids are the same. Moreover, the majority's creation of the "strong presumption" could undermine the very purpose of the PMPA--to protect relatively weak local franchisees from the unfair business practices of powerful and sophisticated oil companies. See Barnes v. Gulf Oil Corp., 824 F.2d 300, 306 (4th Cir.1987) ("[The PMPA] was designed to benefit the small retailer ...." (emphasis in the original)); id. at 305 ("As remedial legislation, the [PMPA] must be given a liberal construction consistent with its goal of protecting franchisees." (citation and internal quotation marks omitted)).* Therefore, I respectfully dissent.
 
 
 
 [1]
 Before the new policy, stations such as Keener's were apparently supplied either by an independent Exxon-brand distributor that purchased gasoline from Exxon and delivered it to the station site, or on a directservice basis by Exxon itself
 
 
 [2]
 Specifically, the franchisor must have either:
 (I) made a bona fide offer to sell, transfer, or assign to the franchisee such franchisor's interests in such premises; or
 (II) if applicable, offered the franchisee a right of first refusal of at least 45-days duration of an offer, made by another, to purchase such franchisor's interest in such premises.
 15 U.S.C. Sec. 2802(b)(3)(D)(iii).
 
 
 [3]
 The dissenting opinion argues that the foregoing presumption is one that is created out of "whole cloth," and one that bears no relation to the purposes of the statute. To the contrary, the presumption is directly tied to the statutory requirement that a right of first refusal be extended. As a matter of basic logic, a valid right of first refusal would seem presumptively extended when the same property is offered the franchisee at the identical price bid by a third party. Moreover, a presumption is often necessary to afford guidance to district courts in the course of the summary judgment process and to prevent a straightforward statutory requirement from becoming a litigious quagmire. Courts have routinely structured statutory proof schemes through the mechanism of presumptions. See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The dissent's approach, by contrast, would leave litigants and district courts at sea
 
 
 [4]
 Keener contends that this point is irrelevant because the DeFazio Oil bid was not finalized into an actual sale until after the increased allotment had been approved. This contention still provides no indication that the station sales contract in itself guaranteed DeFazio Oil a supply of Exxon gasoline
 
 
 [5]
 Because of its distributorship, DeFazio was able to purchase gasoline at the "rack" price. This price advantage most likely made it possible for DeFazio to bid a higher amount and still turn a profit operating what all admit was a high volume station. The $1,200,010 payment may, therefore, be termed the fair market value of the station. Indeed, when a third party makes an offer in cash, or its equivalent, for an item, a "court can justifiably infer that the amount of an arms' length offer represents the value of the station." Ellis v. Mobil Oil, 969 F.2d 784, 786 (9th Cir.1992)
 
 
 *
 I recognize that the hard task of interpreting statutes can, in some cases, be aided by the application of judicially-created presumptions. See generally J. Harvie Wilkinson III, Toward a Jurisprudence of Presumptions, 67 N.Y.U. L.Rev. 907 (1992). In my view, however, this is not a proper case in which to apply such a presumption