**BP WEST COAST PRODUCTS LLC, a Delaware limited liability company, Plaintiff,**

v.

**Raymond MAY; Sharanjeet Ghumman, Defendants.**

Consolidated Cases

No. CV–N–02–0529–LRH(VPC).

United States District Court, D. Nevada.

Dec. 2, 2004.

Rebecca Rivenbark, Scott Glogovac, Burton, Bartlett & Glogovac, Reno, NV, Eugene Pak, Jamie Peterson, Jeffrey Hamerling, Steinhart & Falconer LLP, Piper Rudnick LLP, Kari Gregory, Pro Hac Vice Firm, Piper Rudnick LLP, Matthew Covington, Matthew S. Covinton, Steinhart & Falconer LLP, San Francisco, CA, for Plaintiff.

Brian Padgett, Law Office Of Kermitt L. Waters, Las Vegas, NV, Thomas Bleau, Gennady Lebedev, Martin Fox, Thomas Bleau, Bleau Fox & Fong, APLC, Los Angeles, CA, for Defendants.

## ORDER

HICKS, District Judge.

Before the Court is Plaintiff BP West Coast Products, LLC's (hereinafter "Plaintiff") Motions for Summary Judgment (Docket Nos. 56 & 57). The Defendants Raymond May and Sharanjeet Ghumman (collectively referred to as "Defendants") have filed an opposition and Plaintiff has replied. After consideration of the filings and evidence presented in support of, and in opposition to, the motion for summary judgment, the Court concludes that Plaintiff is entitled to summary judgment. That is, the Court declares that Plaintiff has not violated the Petroleum Marketing Practices Act ("PMPA"). 15 U.S.C. § 2801 *et seq.*

## I. BACKGROUND

Plaintiff sought to sell a number of its ARCO-branded gasoline station facilities. Plaintiff maintains that it sought to sell the facilities to recover its capital investment. To accomplish its objective, the Plaintiff listed nearly fifty facilities with a real estate marketing company and received offers from independent third parties. Two of the facilities were located in Reno and Minden, Nevada, and were operated by Defendants May and Ghumman as franchi-

sees and lessees pursuant to separate written franchise agreements. May's franchise agreement was to expire on March 1, 2003, and Ghumman's franchise agreement was to expire on June 1, 2004.

Pursuant to the PMPA, the Plaintiff notified both Defendants of its decision to sell the facilities, and nonrenew their lessee franchise relationships at the end of their respective terms. Plaintiff listed the facilities with a real estate marketing company, National Real Estate Clearinghouse, Inc. ("NRC"), as its agent for the purpose of obtaining separate sealed bids for the facilities operated by the Defendants as well as other facilities. NRC marketed the facilities and informed the prospective purchasers that they were not purchasing the existing franchises or the franchise-owned equipment. Moreover, NRC informed the prospective purchasers that they would not be able to operate any of the existing franchises until the existing franchise relationships expired by their terms.

Plaintiff received an offer of $1.4 million from an independent third party for the facility operated by Defendant May. Plaintiff received an offer of $890,00 from an independent third party for the facility operated by Defendant Ghumman. Both third-party bidders also agreed to enter into new "contract dealer" relationships with the Plaintiff by agreeing to fifteen-year ARCO-branded gasoline supply agreements and franchises.

Plaintiff offered each Defendant a right of first refusal ("ROFR") to purchase the respective facility. Unlike the third-party bidders, the Defendants had the choice to either enter into new "contract dealer" relationships, or to discontinue their facilities as ARCO-branded facilities.

The Defendants each accepted the individual ROFR, purchased the facilities they had operated, and agreed to long-term supply agreements and franchises. However, the Defendants did so "under protest." The Defendants claim they paid too much for the respective facilities. Their argument in this regard is that the Plaintiff should have given them a discount from the market price for the "goodwill" they claim in their respective businesses. Defendant May claims he overpaid by $370,000, and Ghumman claims he overpaid by $480,000.

## II. STANDARD

A motion for summary judgment is a procedure that terminates, without a trial, actions in which "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A summary judgment motion may be made in reliance on the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any." *Id.*

The movant is entitled to summary judgment if the nonmoving party, who bears the burden of persuasion, fails to designate " 'specific facts showing that there is a genuine issue for trial.' " *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed. R.Civ.P. 56(e)). Thus, to preclude a grant of summary judgment, the nonmoving party must set forth " 'specific facts showing that there is a genuine issue for trial.' " *Matsushita Elec. Indust. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)). The substantive law defines which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All justifiable inferences must be viewed in the light most favorable to the nonmoving party. *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154

(9th Cir.2001)(citing *Zenith Radio Corp.*, 475 U.S. at 587, 106 S.Ct. 1348).

Although the nonmoving party has the burden of persuasion, the party moving for summary judgment bears the initial burden of showing the absence of a genuine issue of material fact. *Metro Indust., Inc. v. Sammi Corp.*, 82 F.3d 839, 847 (9th Cir.1996). That burden is met by showing an absence of evidence to support the nonmoving party's case. *Celotex Corp.*, 477 U.S. at 325, 106 S.Ct. 2548. The burden then shifts to the nonmoving party to set forth specific facts demonstrating that there is a genuine issue for trial. *Liberty Lobby, Inc.*, 477 U.S. at 250, 106 S.Ct. 2505. In meeting this burden, the nonmoving party must go "beyond the pleadings and by its own evidence present specific facts showing that there is a genuine issue for trial." *Far Out Prod. v. Oskar*, 247 F.3d 986, 997 (9th Cir.2001)(citing *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir.1996)) (quotations omitted).

## III. JUDICIAL NOTICE

█ Plaintiff and Defendants request that the Court take judicial notice of a number of court filings in other federal cases. Plaintiff requests the Court take judicial notice of an order granting summary judgment in *BP West Coast Products LLC v. Tung*, Case No. EDCV 02–1095–(VAP)(SGL), among others. Plaintiff also requests the Court take judicial notice of an order granting the Plaintiff summary judgment in *BP West Coast Products LLC v. Robert Greene*, 318 F.Supp.2d 987 (E.D.Cal.2004). *BP West Coast Products LLC v. Greene*, is a recently published decision out of the Eastern District of California. 318 F.Supp.2d 987 (E.D.Cal.

2004). Therefore, the Court may certainly take this case into account as non-binding precedent.

Defendants request the Court take judicial notice of three declarations filed in support of the defendant/counter-claimant Jasbir Tung's opposition to plaintiff BP West Coast Products LLC in the same case for which Plaintiff seeks judicial notice, *BP West Coast Products LLC v. Tung*, Case No. EDCV 02–1095–(VAP)(SGLx). Plaintiff objects to Defendants' request that the Court take judicial notice of these declarations.

A court may take judicial notice of facts that are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.[1] Fed.R.Evid. 201(b). Judicial notice may be taken of court records. *Mullis v. U.S. Bankruptcy Court for Dist. of Nevada*, 828 F.2d 1385, 1388 n. 9 (9th Cir.1987). Accordingly, a court may take judicial notice of the opinions, complaints, briefs, and evidence filed in other actions. *See Egan v. Teets*, 251 F.2d 571, 578 (9th Cir.1957). However, "[a]s a general rule, a court may not take judicial notice of proceedings or records in another cause so as to supply, without formal introduction of evidence, facts essential to support a contention in a cause then before it." *M/V American Queen v. San Diego Marine Const. Corp.*, 708 F.2d 1483, 1491 (9th Cir.1983).

Therefore, in resolving the motions before the Court, the Court will not take judicial notice of the court documents provided for the truth of the facts asserted therein. Rather, the Court will only consider these documents for the purpose of showing that various contentions and arguments have been raised in other actions

---

1. Fed.R.Evid. 201(b): "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

and to review how other courts have addressed these issues. With these considerations in mind, the Court turns its attention to Plaintiff's motions.

## IV. DISCUSSION

Plaintiff moves for summary judgment on its requests for declaratory relief that it did not violate the requirements of the PMPA in selling its interests in the facilities operated by the Defendants, and in nonrenewing the Defendants' franchise relationships. In support of its motion for summary judgment, Plaintiff contends that the undisputed facts show it did not violate the PMPA and it made its decision to sell the facilities in good faith and the ordinary course of business. Conversely, Defendants argue that there are substantial issues of material fact regarding whether Plaintiff's decisions to sell the facilities at issue were made in good faith and the normal course of business. Defendants further argue that these are issues of material fact sufficient to withstand the Defendant's summary judgment motion.

The PMPA governs relationships between franchisors and franchisees in the marketing of motor fuel and, accordingly, governs when an oil company may terminate a franchise relationship with a franchisee. *See* 15 U.S.C. §§ 2801–2806. The Ninth Circuit has recognized that the chief purpose of the PMPA is to remedy the disparities in bargaining power between franchisees and franchisors in order to protect the franchisee's reasonable expectation of continuing the franchise relationship. *Unocal Corp. v. Kaabipour*, 177 F.3d 755, 762 (9th Cir.1999), *cert. denied*, 528 U.S. 1061, 120 S.Ct. 614, 145 L.Ed.2d 509 (1999); *Chevron U.S.A., Inc. v. Lutz*, 271 F.Supp.2d 1196, 1200 (N.D.Cal.2003). However, the PMPA is not "a one-way statute, which should single-mindedly be construed to favor franchisee positions

..." *Kaabipour*, 177 F.3d at 762–763. Moreover, in enacting the PMPA Congress recognized that franchisors need adequate flexibility so that they may "initiate changes in their marketing activities to respond to changing market conditions and consumer preferences." S.Rep. No. 95–731, at 18–19 (1978), *reprinted in* 1978 U.S.C.C.A.N. 873, 877.

Accordingly, the Ninth Circuit has recognized that "[I]n an age of increasing corporate competition, the major firms must retain the freedom to seek greater economic efficiency through corporate reorganizations, mergers and acquisitions." *Unocal Corp.*, 177 F.3d at 762. This is particularly important because "[i]n a rapidly changing economy fixed preservation of business relationships may spell financial death to the detriment of franchisees as well as franchisors.'" *Id.* (internal quotes and citation omitted). In addition, when enacting the PMPA, Congress desired a single uniform set of rules governing the grounds for termination and nonrenewal of motor-fuel marketing franchises. *Id.*

Title 28 U.S.C. § 2802 limits the situations in which a franchisor can decline to renew a franchise relationship. One ground for nonrenewal is if a franchisor in good faith and in the normal course of business decides to sell the premises. 15 U.S.C. § 2802(b)(3)(D)(i)(III). There are, however, restrictions on termination under the PMPA if the termination is because the property is being sold. The franchisor's determination cannot be made for the "purpose of converting the leased marketing premises to operation by employees or agents of the franchisor for such franchisor's own account." 15 U.S.C. § 2802(b)(3)(D)(ii).

There are three conditions that restrict the franchisor's right to freely sell its facilities under the PMPA. First, the franchi-

sor must determine to sell the facility at issue in good faith and in the normal course of business. Second, the franchisor must provide written notice to the franchisee of its intent to not renew a franchise relationship and provide the reasons therefor at least ninety days before the nonrenewal takes effect. 15 U.S.C. §§ 2804 & 2802(b)(3)(D)(iii). Third, the franchisor must make a "bona fide offer to sell, transfer, or assign to the franchisee such franchisor's interest in such premises," or if applicable, offer "franchisee a right of first refusal of at lest 45–days duration of an offer, made by another, to purchase such franchisor's interest in such premises." 15 U.S.C. § 2802(b)(3)(D)(iii).

## A. Good Faith and Normal Course of Business

■ Title I of the PMPA regulates termination of petroleum franchises and specifies the grounds upon which franchises may be terminated or not renewed. The purpose of the PMPA includes protecting a franchisee who has built up substantial goodwill in a station from having his or her franchise arbitrarily taken from him or her. A franchisee who is terminated or not renewed for causes not permissible under the PMPA can bring suit against the franchisor. 15 U.S.C. § 2805(a). As noted above, the PMPA requires that a franchisor make its decision to sell a facility "in good faith and the normal course of business." The PMPA's good faith requirement looks to whether a franchisor's decision was a "sham determination" used as an artifice to terminate or nonrenew a franchise. *Beck Oil Co. v. Texaco Refining & Marketing, Inc.*, 25 F.3d 559, 561–62 (7th Cir.1994); *Ajir v. Exxon Corp.*, 1995 WL 261411, *2 (N.D.Cal.1995). "The good faith requirement looks to whether the franchisor's actions are designed to conceal selective discrimination against individual franchises." *Kaabipour*, 177 F.3d at 767.

When determining whether a decision is in good faith, a court must keep in mind that Congress did not intend "judicial second-guessing of the economic decisions of franchisors." *Svela v. Union Oil Co. of Calif.*, 807 F.2d 1494, 1501 (9th Cir.1987). A court is not to review the objective reasonableness of the franchisor's actions or substitute the court's judgment for that of the franchisor in deciding whether to sell a facility. *Coast Village, Inc. v. Equilon Enterprises, LLC*, 163 F.Supp.2d 1136, 1175 (C.D.Cal.2001). The test for determining good faith is subjective, and the court looks to the franchisor's intent rather than the effect of the franchisor's actions. *Svela*, 807 F.2d at 1501. In determining a franchisor's motive, the court may only review the franchisor's process and proven motive in deciding to sell the facility. *See Coast Village, Inc. v. Equilon Enterprises, LLC*, 163 F.Supp.2d 1136, 1175 (C.D.Cal.2001). As long as the franchisor did not have discriminatory motive and there is no evidence the reasons given for nonrenewal are a pretext disguising an improper purpose, the court should find good faith. *Kaabipour*, 177 F.3d at 767; *Beck Oil*, 25 F.3d at 562; *Massey v. Exxon Corp.*, 942 F.2d 340, 344 (6th Cir.1991).

A franchisor meets the "normal course of business" requirement if its determination to sell was the result of the franchisor's normal decision making process. *Beck Oil*, 25 F.3d at 562; *Sandlin v. Texaco Refining and Marketing, Inc.*, 900 F.2d 1479, 1481 (10th Cir.1990)("While Congress intended the good faith test to prevent franchisors from shielding their decisions with artifice, the normal course of business element examines whether the franchisor made the choice through its usual decision-making process.").

In this case, the Court finds no disputed issue of fact regarding whether Plaintiff's

decisions to sell the facilities were made in good faith and in the normal course of business. Plaintiff has provided substantial evidence that Plaintiff made the decision to sell the facilities as part of its annual evaluation of where its capital could best be employed as well as the performance of its retail gasoline station facilities in the markets where they operate. (Malasavage Decl. ¶¶ 2–7). In performing these evaluations, Plaintiff considered numerous factors in accordance with its overall business strategy. Thereafter, Plaintiff's management identified the markets and locations where it should seek to recover its capital investments by selling its interests in the corresponding facilities. (Malasavage Decl. ¶¶ 6–7). As previously noted "[t]he good faith requirement looks to whether the franchisor's actions are designed to conceal selective discrimination against individual franchises." *Kaabipour*, 177 F.3d at 767. The consolidated cases in this matter arise out of the Plaintiff's decision to sell approximately fifty facilities as a result of its annual evaluation. While the Plaintiff's decision to sell numerous facilities is not determinative on this issue, it weighs heavily in the Plaintiff's favor. Plaintiff's decision to sell a large number of unrelated facilities hardly bespeaks of selective discrimination.

While the franchisor bears the burden of showing that its decision not to renew the franchise relationship is permitted under the PMPA, the franchisee, in opposing summary judgment, must present evidence that the franchisor's decision is a sham, pretextual, or discriminatory, and was not made in the normal course of business. *See Svela*, 807 F.2d at 1501, *Ajir*, 1995 WL 261411, *2 (citing *Marks v. Shell Oil Co.*, 643 F.Supp. 1050 1055 (E.D.Mich.1986), *vacated on other grounds*, 830 F.2d 68 (6th Cir.1987)). As the Plaintiff has met its initial burden, the Defendants must now present evidence that Plaintiff's decision was a sham, pretextual, or discriminatory.

Defendants do not specifically dispute Plaintiff's evidence. However, Defendants do argue that Plaintiff's decisions to sell the facilities were not made in good faith and the normal course of business. According to the Defendants, this is because Plaintiff used the NRC bid process to increase the ROFR purchase prices to Defendants by forcing them to bid on the business goodwill over and above the value of the real property, improvements and equipment.

In support of this, the Defendants argue that genuine issues of material fact exist as to whether Plaintiff's bidding scheme through the NRC process was conceived and conducted in good faith and the normal course of business. More specifically, the Defendants argue that the third-party offers were inflated because the Plaintiff provided the bidders with fuel sales and volumes as included in the bidding package indicating a requirement that the third party enter into a fifteen year ARCO/am/pm franchise agreement. Thus, Defendants argue that the third parties would not have offered as much to purchase the facilities without the ARCO/am/pm franchises.

Defendants rely on *Ellis* for the proposition that the franchisor's interest does not include the value of the franchisee's own goodwill. In this regard, Defendants are correct. *See Ellis v. Mobil Oil*, 969 F.2d 784, 788 (9th Cir.1992). Moreover, Defendants provide the declarations of the two third-party bidders, in which both state that they factored goodwill in their bids for the respective facilities due to the fact that they were going to receive fifteen-year supply agreements for ARCO-branded gasoline. (See, Honein Decl. ¶¶ 10, 11, 12, and Badru Khan Decl. ¶¶ 6–7). Thus, Defendants argue that because Plaintiff's bid-

ding scheme through NRC ensured that as part of the overall bids, the third-party bidders included the monetary value of the franchisees' own business goodwill, Plaintiff was offering Defendants' goodwill, which was not Plaintiff's to sell.

Plaintiff, on the other hand, argues that Defendants' reliance on *Ellis* is misplaced since the court in that case limited its holding to "bona fide" offers to purchase facilities and not, as in this case, to ROFR offers from third parties. *Ellis*, 969 F.2d at 785–86 (Where "a third party's offer is in the form of a single transaction for cash, the court can justifiably infer that the amount of an arms' length offer represents the value of the station."). The Court agrees with the Plaintiff's interpretation of *Ellis*.

Defendants point to the declarations of the third-party bidders as evidence they included the goodwill in their bids. While these declarations may appear to support the Defendants' position, there is a question whether the goodwill was exclusive to the Defendants. As the Plaintiff points out, as a factual matter any goodwill the Defendants possessed in their franchises was lost at the end of their franchise terms. The evidence suggests that the third-party bidders increased their bid amounts because they were going to be entering into long term franchise agreements with the Plaintiff if they were successful bidders. They increased their bid amounts because they would be purchasing ARCO/am/pm branded facilities. There is no evidence that they increased their bid amounts because the facilities had been operated by the Defendants. Thus, the third-party declarations are not sufficient support for an inference that the bidders offered a higher price for the facilities because they included the value of Defendants' goodwill in the purchase price. Most importantly, a goodwill theory is not a recognized basis to vitiate or reform a sale. *Lee v. Exxon*, 867 F.Supp. 365, 368 (D.S.C.1994); *Greene*, 318 F.Supp.2d 987 (E.D.Cal.2004).

Additionally, the Court agrees with and adopts the position of the *Greene* court on this issue, i.e., even if Defendants are correct and Plaintiff's motive was based in part to obtain money from an immediate sale and to continue receiving money in the future from the franchises, the Court does not find this to be an improper motive made in bad faith. *Id.* at 996. As in *Greene*, the Defendants here cite no law to support the proposition that a decision made for a franchisor's financial gain is in bad faith or not in the normal course of business.

In arguing Plaintiff's decision to sell was not in good faith and the normal course of business, Defendants take exception with the bidding system employed by Plaintiff. Defendants argue that "it is not enough that [Plaintiff's] decision to sell [Defendants'] premises by including [them] in the NRC bidding scheme be in good faith and in the normal course of business. The system set up by [Plaintiff] to carry out such sale must be in good faith and in the normal course of business as well." Opp. at 7. As in *Greene*, Defendants cite no relevant support for this proposition. Defendants maintain that this proposition is supported by *Valentine v. Mobil Oil Corp.*, 789 F.2d 1388 (9th Cir.1986). However, *Valentine* dealt with the issue of whether a franchisor was required to make a bona fide offer to sell the station to the franchisee as a condition to materially alter the premises.

On this issue, the *Greene* court found that "absent a requirement that the court must also review the bidding process in determining good faith and in the normal course of business, the court is not inclined to add this requirement." *Greene*, 318

F.Supp.2d at 996. Section 2802(b)(3)(D) only requires that the "determination" to sell a facility be "made by the franchisor in good faith and in the normal course of business."

The Defendants have not provided the Court with any evidence regarding bad faith involved in Plaintiff's determination to sell the facilities. The *Greene* court found, under very similar facts, that any evidence regarding impropriety in the bidding process was at best circumstantial evidence that the franchisor's underlying decision to sell the facilities was not in good faith and in the normal course of business. *Greene*, 318 F.Supp.2d at 996. Likewise, in the present case the Defendants have failed to provide sufficient evidence of irregularities regarding the sale of the facilities to support an inference that the underlying decision to sell was in bad faith.

The PMPA clearly allows for facilities to be sold through a procedure such as the NRC. *Id.* at 996. The only allegations of impropriety by Plaintiff for which Defendants have evidence is that: 1) Plaintiff provided potential bidders with the volumes and sales history for the facilities, 2) the third-party bidder interested in purchasing Defendant Ghumman's franchise facility was not a willing and able buyer, and 3) a third-party bidder violated Plaintiff's own rules prohibiting third-party bidders from having direct contact with franchisees under penalty of disqualification.

Defendants' allegation that Plaintiff provided potential bidders with the volumes and sales history for the facilities does not show bad faith. The volumes and sales

history were given as part of the bidding process. Although this information is generally considered confidential by Plaintiff, the information was provided to bidders to help them value the businesses. The Court agrees that providing this information may have given the bidders an incentive to bid high on facilities that were profitable. However, Defendants fail to provide any authority making Plaintiff's conduct illegal or improper. Likewise, this Court finds that there is no evidence in this case that the Plaintiff's business decision to provide this information was inappropriate or somehow contravened the PMPA.[2]

Defendants' next contention is that there is an issue of material fact regarding whether the third-party offers to purchase the Ghumman franchise facility was a sham because the high bidder was not a ready, willing and able buyer. More specifically, Defendants point out that Badru Khan, a bidder on Ghumman's franchise facility, had not applied for a loan at the time of his bid. That the bidder on Ghumman's franchise facility was allegedly not a willing and able buyer, does not show any bad faith on the part of Plaintiff in this sale. First, there is no evidence that the bidder was not a legitimate third-party bidder who was in a financial position to pay the offer price if Defendant Ghumman declined the right of first refusal. Second, there is no evidence that the third-party bidder did not make the required initial bid deposit of 2.5% of the bid price included with the bid. Likewise, there is no evidence that the third-party bidder did not make the additional 7.5% earnest money requirement on the successful bid.

---

**2.** The *Greene* court noted that it "would presume bidders would want this information when bidding to know an appropriate bid." *Greene*, 318 F.Supp.2d at 997. This Court agrees that it would be difficult to imagine a third-party bidder willing to place a bid upwards of a half-million dollars on an uninformed basis. In fact, the declarations of the third-party bidders state that they believed the "volumes and merchandise sold at the station were good and considered it to be a profitable business." Decl. Badru Khan at 1.

Third, Plaintiff's "Sealed–Bid Real Estate Sale Agreement" provided third-party bidder Badru Khan ninety (90) days from escrow opening to secure a loan. Thus, although the third-party bidder failed to pre-qualify there has been no showing pre-qualification was required or that it was unlikely that the bidder would have qualified in a timely manner. Finally, Plaintiff reserved the right in its sole discretion "to overlook minor inconsistencies or nonconformance in any bid" and "to accept the bid that [Plaintiff] considers in its best interest, whether or not it is the highest purchase price."

Defendants' final contention is that Plaintiff did not disqualify a third-party bidder who violated Plaintiff's own rules prohibiting third-party bidders from having direct contact with franchisees. Defendants contend that Plaintiff forgave a violation of Mr. Khan, a bidder on the Ghumman facility, who contacted the franchisee or employees thereof. Again, however, Plaintiff reserved the right in its bidding procedure "to overlook minor inconsistencies or nonconformance in any bid."

In the present case, Plaintiff has produced evidence that it made a determination in good faith and in the normal course of business to sell the premises. *See* 15 U.S.C. § 2802(b)(3)(D)(iii). Franchisees can only avoid summary judgment if they show that this reason was actually a sham. Defendants have not made such a showing and rely solely on the Plaintiff's alleged conduct in selling the facilities. However, this Court will not second-guess the wisdom of the franchisor's decision. *Svela*, 807 at 1501.

In sum, the Plaintiff franchisor did not have discriminatory motive and there is no evidence the reasons given for the sale of the facilities were a sham, pretext disguising an improper purpose, or discriminatory

in any way. Thus, the Court finds the Plaintiff's decision to sell the facilities was not made in bad faith. *Kaabipour*, 177 F.3d at 767; *Beck Oil*, 25 F.3d at 562; *Massey*, 942 at 344.

## B. Notice

■ The PMPA requires a franchisor to notify an existing franchisee that a franchise will not be renewed at least ninety days before the nonrenewal takes effect. *See* 15 U.S.C. § 2902. Such notice shall be in writing and "shall be posted by certified mail or personally delivered to the franchisee." 15 U.S.C. § 2902(b)(1) & (2). The Notice must contain "a statement of intention to terminate the franchise or not to renew the franchise relationship, together with the reasons therefor." 15 U.S.C. § 2902(b)(3)(A). Plaintiff has provided evidence that on or about April 22, 2002, Plaintiff notified Defendants that it was considering selling its interest in the facilities and nonrenewing the parties' lease franchise relationships. On or about July 31, 2002, Plaintiff notified Defendant May that it had decided to sell the facility and nonrenew the franchise relationship, seven months before the expiration of May's franchise relationship. On or about July 31, 2002, Plaintiff notified Defendant Ghumman that it had decided to sell the facility and nonrenew the franchise relationship, almost two years before the expiration of Ghumman's franchise relationship. The separate notices informed each Defendant that their respective franchise would not be renewed because Plaintiff "had determined in good faith and in the normal course of business to sell the marketing premises."

Defendants do not dispute the timeliness of the notices from Plaintiff. In fact, Defendants acknowledge to having received the notices on a timely basis. Defendants further acknowledge that the notices "par-

roted the language of the PMPA." However, Defendants claim the notices did not provide sufficient reasons for the termination. The Court disagrees with the Defendants' and finds that the notices clearly indicated that the franchises were not being renewed due to Plaintiff's decision to sell the respective premises. Defendants were informed of their rights to purchase the facilities. The notices were timely and concise. The Court finds they were sufficient to have provided Defendants with the reason for the nonrenewal.

Defendants also argue that the notices falsely stated that Plaintiff did not intend to renew the franchises. Defendants argue that in reality, once the facilities had been sold, Plaintiff did renew the franchise relationships. Thus, according to Defendants, the Plaintiff never intended to non-renew the franchises. The Court finds no merit to this argument. There is no evidence that at the time Plaintiff sent the notices, Plaintiff was in fact planning to renew the franchises. This argument is a logical impossibility and, simply put, the argument refutes itself. In the instant case, the Plaintiff determined to sell the facilities and attempted to do so through the NRC process. Plaintiff could not both intend to renew Defendants' franchises and also sell the facilities through the NRC process because the facilities may have been sold to another buyer.

The Defendants were also informed regarding their rights to purchase the facilities and of the terms under which Plaintiff would grant new franchises. Finally, the original franchise relationships Defendants had with Plaintiff did in fact terminate. Defendants now have contract-dealer franchises instead of franchises as lessees of the stations. While in practical terms the two types of franchises may be similar, Defendants have not shown a disputed issue of material fact

that at the time Plaintiff sent the notices Plaintiff actually intended to renew Defendants' old franchise agreements. In sum, the Defendants' argument is unpersuasive regarding the inadequacy of the notice provided by Plaintiff. Plaintiff's timely notices of nonrenewal provided the Defendants with information sufficient for them to verify whether Plaintiff's nonrenewal rested on grounds permissible under the PMPA. The PMPA does not require more than that. *See Svela,* 807 F.2d at 1498; *Southern Nev. Shell Dealers Ass'n,* 634 F.Supp. at 68. Thus Plaintiff has satisfied the PMPA's second requirement as a matter of law. *See* Fed.R.Civ.P. 56(c).

**C. Bona Fide Offer or Right of First Refusal**

■ Before selling a facility, a franchisor must give the franchisee an opportunity to purchase the subject facility. 15 U.S.C. § 2902(b)(3)(D)(iii). Section 2902(b)(3)(D)(iii) provides that in the case of a leased marketing premises, the franchisor must "either—(I) [make] a bona fide offer to sell, transfer, or assign to the franchisee such franchisor's interests in such premises; or (II) if applicable, [offer] the franchisee a right of first refusal of at least 45–days duration of an offer, made by another, to purchase such franchisor's interest in such premises." In this case, Plaintiff followed the second option and offered Defendants the right of first refusal to purchase the facilities. Defendants appear to contend, however, that the third party offers were not valid third-party offers because of various improper conduct that allegedly occurred during the bidding process.

As noted above, Defendants contention is that the third-party purchase prices were inflated by the bidding process. Defendants cite to the evidence showing

Plaintiff provided confidential sales information. As discussed above, the Court does not find that providing this information was improper. While Plaintiff considered the information confidential, Defendants have cited no authority for the proposition it was inappropriate for Plaintiff to provide this information to bidders. The Court finds nothing in the PMPA that prohibits a third party from receiving information about potential future profits. *Greene,* 318 F.Supp.2d at 998.

Defendants also contend they were required to pay for more than the fair market value of the facilities because the third-party bids included other arrangements. Defendants provide evidence from appraisers who appraised the respective facilities at less than the purchase prices. Defendants take the position that they should not have had to pay the third-party purchase prices because Plaintiff had offered to enter into an ARCO/am/pm franchise with the third parties if they purchased the individual facilities. In other words, Defendants claim the purchase prices of the facilities were inflated because they included the promise to enter into an ARCO/am/pm franchise agreement in the future. Defendants argue that without the promise of the franchises, the third-party bidders would not have bid as much as they did. Defendants have provided declarations of the bidders to support this argument. However, the Court finds the Defendants' argument without merit. Likewise, the *Greene* court found that a third-party bid that may have included a promise or understanding that the third party would be given a franchise in the future does not mean that the third-party bid violates the PMPA. *Id.* at 998.

"[B]idders routinely come to the table with different hands." *Keener v. Exxon Company, U.S.A.,* 32 F.3d 127, 132 (4th Cir.1994). "A prospective buyer who does not currently have a franchise would come to the table with different needs than a prospective buyer who already has a franchise and is currently leasing a facility for sale." *Greene,* 318 F.Supp.2d at 998. This does not, however, make the third-party bidders' offers for the facilities any less legitimate. *Id.* "An actual price, agreed to by a willing buyer and a willing seller, is the most accurate gauge of the value the market places on a good." *Keener,* 32 F.3d at 132. The purchase price is a measure of what the station is worth to a purchaser in the third party's position. The Court can infer that such an amount represents the value of the facility. *Ellis,* 969 F.2d at 786. Furthermore, the presumption of validity to third-party bids "comports with the desire not to transform a simple statutory requirement into a complex and cumbersome one necessitating a detailed economic analysis of private sector decisions." *Keener,* 32 F.3d at 131 (In *Keener,* the Fourth Circuit Court of Appeals reviewed the propriety under the PMPA of a franchisor's non-renewal of a franchise and offer to sell the facility at the same price bid by a third party).

Here, Plaintiff argues that the fact it and the third parties would enter into new franchise relationships "after" the Defendants' own franchises agreements had expired does not have any relation to whether Plaintiff complied with the PMPA. The Plaintiff cites *Lee,* 867 F.Supp. 365, to support its argument. The plaintiff in *Lee* purchased the franchise facility after the defendant had received a bid from a third party and provided the plaintiff with his right of first refusal. *Id.* at 366. The plaintiff in *Lee* sought to reform the sale alleging that the franchisor had sold goodwill belonging to him because the third party's bid was higher than what the plaintiff believed was the market value for the facility. *Id.* at 368. The court disagreed and found that not only had the plaintiff

failed to provide any evidence to support his claim that goodwill attached to the premises, but a goodwill theory is not a recognized basis to vitiate or reform a sale. *Id.* at 368.

Finally, Defendants argue that they are entitled to bona fide fair market value offers under *Ellis*, 969 F.2d 784 (9th Cir. 1992). Defendants argument under *Ellis* is that the remedy for Plaintiff's alleged failure to comply with the PMPA in the instant case should be that Plaintiff comply with the "bona fide offer" requirement, rather than the right of first refusal requirement. Defendants rely on *Ellis*, for the proposition that a third party offer that includes other factors is not allowed by Section 2802(b)(3)(D)(iii)(II), and in such a circumstance, a bona fide offer must be given. Contrary to Defendants's position, The Ninth Circuit did not find the third-party offer in *Ellis* invalid because it included the value of "independent components." Rather, the court refused to allow the third-party offer because the offer involved multiple facilities and it was impossible to determine the value of any one of them. In any event, the Court finds that *Ellis* is inapplicable to the present case because the offers made in the present case were for individual facilities.

The evidence presented in this case confirms that Plaintiff exercised its right to sell the facilities on a good faith business decision and in the normal course of business. The undisputed evidence shows that Plaintiff's written offer complied with the requirements of 15 U.S.C. § 2802(b)(3)(D)(iii). The offer which Defendants accepted was the same offer extended to Plaintiff by third-party bidders operating under normal market forces. As the *Keener* court observed, "An actual price, agreed to by a willing buyer and a willing seller, is the most accurate gauge of the value the market places on a good.

Until such an exchange occurs, the market value of an item is necessarily speculative." *Keener*, 32 F.3d at 132. Defendants have failed to come forward with evidence sufficient to overcome the statutory presumption as to the propriety of this transaction. A franchisee only has "the right to match" the terms of the contract between the franchisor and the prospective buyer. The franchisees are not entitled to any "special price discounts." *Ballis v. Mobil Oil Corp.*, 622 F.Supp. 473, 475 (D.C.Ill.1985). Defendants were afforded that opportunity here and they accepted, albeit under protest. The Court finds that the right of first refusal presented to the Defendants satisfied the requirements under the PMPA. Accordingly, the Court finds summary judgment in favor of Plaintiff appropriate on the PMPA claims.

## V. CONCLUSION

Plaintiff has met its burden on summary judgment and it has demonstrated that it made its decision to sell in good faith and the normal course of business, that its notice was timely, and that it offered Defendants an opportunity to purchase the facilities on the same terms as the third parties. Defendants have not met their burden, and have not made a showing that there is any genuine issue of material fact to be resolved by a trier of fact. The Court finds that Plaintiff did not violate the PMPA in these cases. The Defendants' counterclaims under the PMPA are dismissed accordingly.

**ACCORDINGLY, IT IS HEREBY ORDERED** that the Plaintiff's Motions for Summary Judgment in these declaratory relief actions (Docket Nos. 56 & 57) are **GRANTED.**

**IT IS SO ORDERED**